Thomas S. Agresta, J.
This is an application by the District Attorney for an order directing that John Smith, an inmate of the Queens House of Detention for Men, be directed to submit to a surgical procedure to be conducted by Dr. Harold Fishbone, a duly appointed police surgeon for the Fifth Medical District of the New York City Police Department, for the purpose of removing a bullet presently lodged in -his body.
A hearing was held pursuant to an order of this court, and the court now makes the following findings of fact and conclusions of law.
It has been established that the District Attorney is in the •midst, of an investigation into the homicidal death of Police Lieutenant Henry Schmiemann, who was shot and killed by an Unknown assailant on June 20, 1974. Affidavits previously sub *211 mitted by the District Attorney indicate probable cause to believe that the bullet presently lodged in the body of the respondent, John Smith, could be material and of vital importance in the investigation of this homicide.
On July 16, 1974, the court, upon application of the District Attorney, ordered the respondent to submit to a physical examination to be conducted by Dr. Fishbone to determine 11 whether or not there is a bullet presently lodged in the body of the respondent and if so what procedures are necessary to surgically remove it and to what extent if any the health of the respondent might be impaired by its removal ”.
The ¡court also allowed equal opportunity, if desired, for the respondent to have a doctor of his own choosing’ examine him under the same conditions set forth for Dr. Fishbone.
At the hearing Dr. Fishbone testified that he had conducted a complete and thorough physical examination of the respondent John Smith and that he had made the following findings.
X rays indicated a metallic foreign body lodged beneath the rhomboid muscle in the posterior chest wall underneath the muscles of the chest wall, and outside the actual thoracic cavity itself.
In order to remove the foreign metallic body, an incision at least six inches long would have to be made through the skin. The incision would then be deepened through the subcutaneous tissue and then through the trapezius muscle, and then very likely by splitting and pushing aside the rhomboid muscles. Then in that area surrounded by some fibrous reaction, the bullet would be encountered. It would then have to be dissected out of the tissue in which is was lying buried and removed. The incision would then be closed in layers; the .various muscular fascial structures would be closed; and, depending upon the adequacy of control of hemorrhage from all the small vessels that would be cut in the ihuscle, it is likely that a rubber drain would be put down into the depth of the incision to allow for any collection of oozing of blood and to indicate whether any bleeding was going on in the depths of the incision after the incision had been closed. The drain would be in there, possibly 24 to 48 hours. The whole operation would take about an hour. The procedure would be done under general anesthesia and assisted respiration would be utilized,, as the patient’s chest might be compressed by his own body weight, making normal breathing difficult and inadequate. This would be done by means of a tube put down through the windpipe, connected to an anesthetic device which would expand the patient’s lungs either *212 manually oir mechanically. The piatient would then have to be hospitalized' about seven or eight days. Dr. Fishbone categorized this operation as major surgery but that in his opinion it would not substantially endanger either life o,r limb. However, he added, there is a minimal risk of death from cardiac arrest as a consequence of general anesthesia, and there are other complications of general anesthesia, such as respiratory complications as a result of having a tube put down the throat, and the irritation of the lungs from inhalation of anesthesia. There might also be abnormal reactions to any of the drugs or other agents that are used in the induction and maintenance of general anesthesia and a very small risk following general anesthesia of the development of pulmonary embolism.
There is also a small possibility of infection, which is always present in any surgical procedure with the possible effect of damage to the muscular tissue and excessive scar formation. Hemorrhage is also a possible complication.
Upon cross-examination the doctor admitted that there would be pain and suffering during the healing process and that the operation would leave a permanent sear. It was also ibis opinion that the bullet could stay in the respondent’s body for the rest of his life without endangering his life or health.
The respondent seeks to prevent such surgical removal ¡because if is not necessary for his recovery and is not medically advisable; that the surgical procedure would involve serious risk to respondent’s health and physical well being because of the pain and trauma, and the nature of the surgical operation itself; and that the surgical procedure sought is prohibited by the Due Process Clause of the Fourteenth Amendment .to the United States Constitution as well as the Fourth Amendment proscription against unreasonable search and seizure and the constitutional injunction against self incrimination.
This is a case of first impression in this State and the fundamental question to be resolved is whether the seizure of the bullet from the body of the respondent can be done in a manner that would be consistent with and not violative of the constitutional rights of the respondent.
The standard by which a State can conduct reasonable Fourth Amendment searches is delineated in Schmerber v. California (384 U. S. 757) . There the Supreme Court thoroughly explored the propriety of entering the body to obtain incriminating evidence holding that evidence of analysis of a defendant’s blood taken over his objection by a physician while defendant was in a hospital, after being arrested, was not inadmissible on grounds *213 that it violated the Fifth Amendment privilege against self incrimination and that the taking of blood did not violate his right under the Fourth Amendment .to be free of unreasonable searches and seizures.
In Schmerber, supra (p. 764) the court stated: “ federal and state courts have usually held that [the constitutional privilege] offers no protection against compulsion to submit to fingerprints, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, oir to make a particular gesture. The distinction which has emerged often expressed in different ways, is that the privilege is a bar against compelling ‘ communications ’ or ‘ testimony,’ but that compulsion which makes a suspect or accused the source of 1 real or physical evidence ’ does not violate it.” (See, also, Cupp v. Murphy, 412 U. S. 291; United States v. Mara, 410 U. S. 19; United States v. Dionisio, 410 U. S. 1; and Davis v. Mississippi, 394 U. S. 721.)
In respect to the defendant’s Fourth Amendment safeguards the court in Schmerber continued (p. 768): “We begin with the assumption that once the privilege against self-incrimination has been found not to bar compelled intrusions into the body for blood to be analyzed for alcohol content, the Fourth Amendment’s proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness ”.
However, the concluding paragraph in this decision issued a restrictive warning as to the permissible extent of an intrusion or invasion of the human body, the court stating (p. 772): “ We thus conclude that the present record shows no violation of petitioner’s right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual’s person is a cherished value of our .society. That we today hold that the Constitution does not forbid the State’s minor intrusions into an individual’s body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions
*214 In Rochin v. California (342 U. S. 165) the Supreme Court held that the forced stomach pumping of a suspect in order to obtain evidence of possession of narcotics was per se unreasonable and in violation of the Due Process Clause of the Fourteenth Amendment. Justice Frankfurter in his opinion stated (pp. 1169, 17)2): “ Regard for the requirements of' the Due Process Clause ‘ inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain Whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses. ’ * * * this course of proceeding by agents of government to obtain evidence is bound to ioffend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation. ’ ’
Three States have ruled on the propriety of an operation for the removal of a bullet from the human body. While not agreeing in the final result, each agreed that the standard set forth in Schmerber v. California (supra) was controlling. The interpretation of each court of what constitutes a minor intrusion or a major intrusion was the determining factor in the decision in each case.
In the State of Georgia, two cases have been reported since October, 1972. In Creamer v. State (229 Ga. 511 [Sept. 26, 1972]), it was established that a bullet was lodged in the fat ■subcutaneous area of the right side of the chest, that it could be removed in no more than 15 minutes with a local anesthetic and that there would be no risk to the defendant. The court basing its decision upon its interpretation of Schmerber v. California {supra) found that the removal of the bullet in this case would amount to a minor intrusion into the body of that defendant and would not violate his rights under the Constitution of the United States. The removal of the bullet was allowed.
In a later case in the .same State, Allison v. State of Georgia (129 Ga. App. 364 [June 25, 1973]) the court reluctantly followed the Creamer decision where la bullet was superficially -lodged in a defendant’s right side just beneath .the skin and could be removed without ¡any damage to the defendant. In the State of Indiana, Adams v. State of Indiana (299 N. E. 2d 834, 837) decided August 10, 1973, that court also f ollowing the standards set by Schmerber (supra) held that any surgical operation to remove a bullet is an intrusion ii of the most serious magnitude”. The court would .not force a surgical operation *215 on a defendant for the purpose of removing a bullet though the bullet was superficially lodged in his hips and buttocks.
1 And finally in the State of Arkansas, Bowden v. State of Arkansas (15 Cr. L. Rep. 2370) the court following the standards established in Schmerber v. California (supra) and Rochin v. California (supra) denied an application to remove a bullet lodged in the defendant’s spinal canal holding that it constituted a major intrusion into the petitioner’s body.
The medical evidence in the case at bar indicates that major surgery is called' for to remove the bullet lodged in the body of this respondent. In the opinion of this court, the proposed operation would constitute a major intrusion into the body of the respondent that would involve trauma and pain and a possible risk of life and is over and beyond the minor intrusion standard set down in Schmerber v. California (supra). The court finds that the use of the surgical knife to the extent indicated in this case is offensive to the sense of fair play and decency and the American way of life and is therefore prohibited by the Due Process ¡Clause and the Fourth Amendment of the Constitution against unreasonable searches and seizures.
Accordingly the motion is denied in all respects.