The STATE, Respondent, v. Larry Ford ALLEN, Appellant.
291 S. E. (2d) 459)

May 5, 1982.

## ORDER

### APPEAL DISMISSED

Appellant, along with his co-defendant Walter Childers, Jr., has been charged with murder, attempted armed robbery and other crimes in connection with an incident in Greenville County. The lower court ordered appellant to submit to surgery to remove a bullet from below the skin near appellant's left shoulder. Appellant has appealed from this order, and respondent moves to have the appeal dismissed.

We are of the view that the lower court's order properly sets forth and disposes of the issues in this matter. The appeal is dismissed and it is ordered that the lower court order, as modified, be published as the directive of this Court.

## JUDGE PYLE'S ORDER

Pursuant to the Order of this court dated March 22, 1982, the Defendants were examined by surgeons, selected by the Solicitor of the Thirteenth Judicial Circuit and the Defense attorneys, to ascertain whether their bodies contained bullets and, if so, what surgical procedures would be necessary to effect their removal. The examinations were ordered to determine whether motions should be granted requiring the Defendants to submit to surgical removal of such evidence. The motion is granted as to Larry Ford Allen, and denied as to Walter Childers, Jr.

The defendants are charged with murder, attempted armed robbery, assault and battery with intent to kill and conspiracy in connection with an attempted armed robbery at Coker's Supermarket in Greenville County on March 10, 1982. After hearings on March 19, 1982 and March 22, 1982, at which defendants were represented by counsel and written and oral testimony were presented, I found that the Solicitor had established probable cause that these defendants may have been present at and participants in the crimes charged and that their bodies may contain critical evidence thereof, and that substantial need[1] for the evidence was demonstrated. I further concluded that this State would permit court-ordered surgical removal of physical evidence of a crime from a Defendant's body, provided the procedures insuring the Defendant's rights developed by case law from other jurisdictions were complied with. Therefore, having previously ordered the Defendants to be examined by surgeons, a hearing was held on April 2, 1982 for the purpose of taking medical testimony to establish the degree of intrusion into their bodies

---

[1] My finding of necessity was affirmed by my ruling at this hearing on a Defense petition, which would have required the State to conduct all laboratory analysis, expert examinations and witness investigation prior to and for the benefit of any determination by this court on the Solicitor's motions. To grant this relief would have required virtually a full trial on the merits.

and whether the surgical removal would endanger their health, safety or life.

The United States Supreme Court decision in *Rochin v. California,* 342 U. S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952), imposes upon this court a duty to exercise its judgment in ascertaining whether the requested surgery would "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." Id. at 169, 72 S. Ct. at 208. There, the Court found the course of proceeedings by agents of the government to obtain evidence—illegally breaking into the privacy of the defendant, struggling with him to open his mouth and remove what was there, and failing that, the forcible extraction of his stomach's contents—to be "conduct that shocks the conscience" and "bound to offend even hardened sensibilities."

However, in *Schmerber v. California,* 384 U. S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), the Supreme Court held that the withdrawal and chemical analysis of blood from the defendant, over his objection, violated neither the Fifth Amendment right to remain silent nor the Fourth Amendment provision against unwarranted search and seizure:

History and precedent have required that we today reject the claim that the Self-Incrimination Clause of the Fifth Amendment requires the human body in all circumstances to be held inviolate against state expeditions seeking evidence of crime.

Id. at 767, 86 S. Ct. at 1834. Since the blood test evidence, although an incriminating product of compulsion, was neither the accused's testimony nor evidence relating to some communicative act or writing, it was not barred by the Fifth Amendment. Further, the Fourth Amendment was found not to forbid minor intrusions by the State into an individual's body under stringently limited conditions. Basing its conclusion on the principle that the integrity of an individual's person is a cherished value of our society, the Court stated:

[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which

are not justified in the circumstances, or which are made in an improper manner. Id. at 768, 86 S. Ct. at 1834.

Citing both *Rochin* and *Schmerber,* the Courts of four states and the District of Columbia have expressly or implicitly held court-ordered surgical removal of bullets to be constitutionally permissible when justified under the circumstances and performed in a proper manner.[2] Further, the procedures for determining need and method of removal, similar to those utilized in the instant cases, were sanctioned by the Courts of two other states although the ultimate question of removal was not reached.[3] Finally, only one state has concluded that surgical procedures for removal of bullets pursuant to a court order, regardless of the circumstances, are "per se" violative of the Defendant's Fourth Amendment rights.[4]

In *Creamer v. State, supra,* the testifying physician found an entry wound but no exit wound in the defendant, and stated that he could feel a foreign body in the fat, subcutaneous area of the right side of the chest, within the area of the muscle. X-Ray examination further indicated the presence of steel which could have been a bullet. The doctor concluded the bullet could be removed with a local and not a general anesthetic, and that no risk to the defendant would be involved in either administering the local anesthetic or in removing the bullet although it would involve a cutting procedure. Similarly, there was uncontradicted evidence by a surgeon in *Allison v. State, supra,* that the bullet lodged under the defendant's skin might be surgically removed without

---

[2] *Bowden v. State,* 256 Ark. 820, 510 S. W. (2d) 879 (1974); *Creamer v. State,* 229 Ga. 511, 192 S. E. (2d) 350 (1972), cert. dismissed, 410 U. S. 975, 93 S. Ct. 1454, 35 L. Ed. 2d 709 (1973), and *Allison v. State,* 129 Ga. App. 364, 199 S. E. (2d) 587 (1973), cert-denied 414 U. S. 1145, 94 S. Ct. 899, 39 L. Ed. 2d 101 (1974); *State v. Richards,* 585 S. W. (2d) 505 (Mo. App. 1979), and *State v. Overstreet,* 551 S. W. (2d) 621 (Mo. 1977); *People v. Smith,* 80 Misc. 2d 210, 362 N. Y. S. 2d 909 (1974); *United States v. Crowder,* 543 F. 2d 312 (D. C. Cir. 1976), cert. denied, 429 U. S. 1062, 97 S. Ct. 788, 50 L. Ed. 2d 779 1977), and *Hughes v. United States,* 429 A. 2d 1339 (D. C. App. 1981).

[3] *State v. Anonymous,* 32 Conn. Supp. 306, 353 A. 2d 789 (1975); *State v. Martin,* 404 So. 2d 960 (La. 1981).

[4] *Adams v. State,* 260 Ind. 663, 299 N. E. (2d) 834 (1973), cert. denied 415 U. S. 935, 94 S. Ct. 1452, 39 L. Ed 2d 494 (1974).

damage to life or limb. Thus, removal was found proper in both Georgia cases.

The United States Court of Appeals for the District of Columbia considered the propriety of ordering the removal of two bullets from the defendant in *United State v. Crowder, supra.* One bullet lodged in Crowder's left thigh was not ordered removed on the basis of medical testimony that such a procedure might cause reduction of use or function of his leg. A second bullet was lying immediately under the skin of the defendant's right forearm, not in any muscle or effective portion of any major nerves or veins. The court-ordered surgical removal of the second bullet was found proper on the following medical testimony:

It is . . . my medical opinion, based upon reasonable medical certainty, that the surgical removal of the slug would not involve any harm or risk injury to Mr. Crowder's arm or hand or the use thereof. The surgical removal of the slug would be considered as minor surgery. . . . It is a superficial lesion, just like removing a small sebaceous cyst; it would not produce any lasting defect that I can envision. 543 F. 2d 312, 313, 314.

*Hughes v. United States, supra,* a second District of Columbia case, involved three bullets found by the court to be readily and safely removable from under the defendant's skin. The medical testimony concluded:

the bullets could be removed under local anesthesia, and that each requisite incision would necessitate but one or two sutures. If such a procedure were to be performed in a normal office-type situation, the patient would be released to go home about fifteen minutes after the bullets had been extracted. 429 A. 2d 1339, 1340.

The Missouri Supreme Court has twice considered the propriety of court-ordered surgical removal of bullets with differing results. In *State v. Overstreet, supra,* the Court held improper the lack of an adversarial hearing and opportunity for appellate review, and the failure of the Court to find the degree of intrusion resulting from surgically retrieving a bullet from defendant's buttocks. However, two years later in *State*

*v. Richards, supra,* the same Court found the lower court to have followed proper procedures, and affirmed its finding, on the basis of medical testimony, that the removal of the bullet from 4 inches below the skin in the defendant's right hip was proper:

This would not be a minor or major operation. There were no vital organs in the particular area where the bullet was lodged. The operation would not be a difficult one with the x-ray equipment then available. There would no [sic] no danger to life, limb, tissue, muscle or ligaments. 585 S. W. (2d) 505, 506.[5]

The Supreme Court of Arkansas permanently stayed a lower court order requiring the surgical removal of a .38 caliber slug from the defendant in *Bowden v. State, supra.* Two doctors had testified at an evidentiary hearing about the required surgical procedure to remove the bullet from the defendant's lower spinal canal. Both agreed that a general anesthetic would be required and that removal could cause a worsening of Bowden's condition due to the involvement of spinal nerves. The opinion was also expressed that the surgery involved a fatal risk and each doctor characterized the operation as a "major intrusion" into the human body. Citing *Schmerber* as allowing minor, but not substantial, intrusions into an individual's body, the Court concluded the proposed major surgery offended the defendant's Fifth Amendment rights.

Finally, a New York court concluded surgical removal would be improper in *People v. Smith, supra,* where x-rays indicated a metallic foreign body was lodged in the defendant beneath the rhomboid muscle in the posterior chest wall, underneath the muscles of the chest wall, and outside the actual thoracic cavity. The doctor categorized the operation as major surgery with resulting pain and suffering, permanent scarring and possible risk of life. The procedure, had it been ordered, would have included use of a general anesthesia, assisted respiration, the insertion of a temporary blood drain-

---

[5] The depth of the bullet under the skin in *State v. Richards* is particularly noteworthy. Since the medical testimony could neither classify the surgery as major or minor, the court considered the fact that a medical reason for removing the bullet existed.

age tube for 24-48 hours, a six inch long incision through the skin, subcutaneous tissue and the trapezus muscle, followed by seven to eight days of hospitalization.

Although the preceding state cases are of non-binding precedential value, I find the common thread of factual determination running throughout them to be well-reasoned and protective of Constitutional rights and Due Process. Therefore, to grant the Solicitor's requests for an Order directing these defendants to undergo surgical removal of bullets from their bodies, I must conclude the contemplated medical procedures comply with the requirements of *Rochin* and *Schmerber* by resulting in only minimal intrusion into the defendants' bodies. However, should I determine the proposed operations constitute major intrusions into the defendants' bodies, the Solicitor's motions must be denied.

The Defendant, Walter Childers, Jr., was examined by Dr. Laurie N. Ervin and Dr. Robert Terry who testified that x-rays disclosed a bullet lying in the "gutter" of Childers' left thoracic cavity, approximately three-quarters to one inch below the skin and just beneath the rib and muscle. Surgical removal of the bullet from this defendant would require a procedure known as a "limited thoracotomy," a forty-five minute to two hour operation classified by both surgeons as "major." An incision, four to eight inches long and one inch deep, would be made in the left lateral chest between the ribs, through the connecting muscle, and into the chest cavity. The ribs would then either have to be divided or a whole or portion of a rib removed. Closing the incision would involve a continuous suture in the muscle, eight to ten sutures in the subcutaneous or fatty tissue under the skin, and twelve or more stitches in the skin itself.

Both doctors testified that the procedure would require the use of a general anesthetic, and might require assisted respiration if muscle relaxants were utilized. Dr. Terry stated the procedure would also require the implantation of hoses for the drainage of blood and fluid and evacuation of air from Childers' chest for one to two days after the operation. The doctors agreed the defendant would suffer pain requiring medication, and would be hospitalized from four to ten days

after the surgery. Neither expected any lasting or permanent injury to the defendant were the operation performed, but both testified regarding potential risks from surgery. Although the probability of any risk is admittedly minimal, complications resulting in cardiac arrest, pneumonia or blood clot formation could arise from the administration of the general anesthesia. Another minimal risk is infection in the wound or incision. Finally, the doctors agreed that there is no medical necessity requiring the removal of the bullet from Childers' body.[6]

The Defendant, Larry Ford Allen, was examined by Dr. Jeffrey A. Macfie, Jr., in addition to Doctors Ervin and Terry. The medical conclusions of Dr. Ervin were generally concurred in by the other two surgeons. The testimony indicated that Allen had suffered a gunshot wound of the left chest, and that a bullet could be easily felt less than a quarter of an inch below the surface of the skin near his left shoulder:

[H]e had a mass or nodule which was tender which would coincide with the location of the bullet or missile on his posterior chest, right . . . alongside the tip of his left shoulder blade, which was just underneath and actually attached to the undersurface of the skin itself.

The operation to remove the bullet was characterized as "minor" involving "less surgery than removal of a mole," and could be performed in approximately fifteen minutes in a doctor's office. The skin overlying the bullet would be cleansed, anesthetized by an injection of novocaine or other local anesthetic, and a small incision of one-quarter to three-fourths inch over the bullet would be made to remove the lead. The skin would then be sutured back together. There would be almost no loss of blood, only minimal pain treatable with one or two doses of Darvon or aspirin, and no permanent injury. The only risk in perfoming this operation is one of superficial infection in the incision, the probability of which was stated .

---

[6] Dr. Ervin stated: "[I]f [bullets] be within an area of the body where they're not rubbing up against a nerve or pressing on a nerve or pressing on some other vital organ, generally they're thought not to cause any sort of later problem . . . [it's] remotely possible that it could in itself cause a delayed appearance of an infection from germ or foreign material·that might lie with the bullet."

to be minimal. Finally, there was testimony that a medical necessity may exist for removing the bullet from Allen's body.[7]

I find that removal of the bullet from the defendant, ■ Walter Childers, Jr., would require major surgery procedures involving a substantial intrusion into his body and risk to his health, safety or life. A court order requiring Childers to undergo surgery under these circumstances would surpass the limited holding of *Schmerber*, which allows only "minor intrusions," and work an injustice on the defendant's Fourth Amendment rights. However, I must conclude that a court-ordered surgical removal of the bullet from the defendant, Larry Ford Allen, would fall squarely within the ambit of *Schmerber* and subsequent bullet-removal cases from other jurisdictions. I find, on the basis of the uncontradicted medical evidence, that the bullet lodged superficially beneath Allen's skin could be removed, without any harm or risk of life or injury, by minor surgery and under local anesthetic. I further find that the operation on Allen would constitute a minor intrusion permissible under *Schmerber* and is justified under the circumstances. Therefore, it is,

ORDERED, ADJUDGED and DECREED that the Solicitor's motion, requiring the Defendant, Walter Childers, Jr., submit to the removal of a bullet from his body, is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

(1) A surgeon, to be selected by the Defendant, Larry Ford Allen, shall within five days remove from Allen's left posterior chest the foreign matter disclosed by x-rays and positively believed to be a bullet. The Sheriff is instructed to transport Larry Ford Allen to the location designated by the surgeon for the purpose of having this operation performed.

(2) If after five days the Defendant has failed to select a surgeon and submit to removal of the foreign matter, the

---

[7] Dr. Ervin testified that "if a patient came to me and asked me about this I would advise him to have it removed because it's painful, it's tender, it hurts to move the shoulder. Probably if left there it would eventually erode through the skin itself and work its way out." Dr. Macfie agreed that the potential for erosion through the skin existed but testified "leeway of several months" was available thus reducing any immediate medical urgency.

Sheriff is instructed to transport Larry Ford Allen to the emergency room at Greenville General Hospital for the purpose of having the operation performed by Dr. Robert Terry, Resident Surgeon of Greenville Memorial Hospital.

(3) Such removal is to be done with accepted medical procedures, with due regard given to the health and preservation of life of Larry Ford Allen.

(4) If at any time during the course of the removal procedures, danger to the life of Larry Allen Ford develops, such removal procedures shall cease and such steps shall be taken as may be necessary to protect the health and life of Larry Ford Allen.

(5) After the removal of the foreign matter, the foreign matter shall be turned over to an authorized representative of the Greenville County Sheriff's Department, who shall have been present during the surgery and who is to make a return to the Chief Magistrate of Greenville County in accordance with S. C. Code Ann. § 17-13-140. (1976).