# WINSTON, SHERIFF, ET AL. *v.* LEE

No. 83–1334.  Argued October 31, 1984—Decided March 20, 1985

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, POWELL, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 767. BLACK-MUN and REHNQUIST, JJ., concurred in the judgment.

*Stacy F. Garrett III* argued the cause and filed a brief for petitioners.

*Joseph Ryland Winston* argued the cause and filed briefs for respondent.

JUSTICE BRENNAN delivered the opinion of the Court.

*Schmerber* v. *California*, 384 U. S. 757 (1966), held, *inter alia*, that a State may, over the suspect's protest, have a physician extract blood from a person suspected of drunken driving without violation of the suspect's right secured by the Fourth Amendment not to be subjected to unreasonable searches and seizures. However, *Schmerber* cautioned: "That we today hold that the Constitution does not forbid the States['] minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.*, at 772. In this case, the Commonwealth of Virginia seeks to compel the respondent Rudolph Lee, who is suspected of attempting to commit armed robbery, to undergo a surgical procedure under a general anesthetic for removal of a bullet lodged in his chest. Petitioners allege that the bullet will provide evidence of respondent's guilt or innocence. We conclude that the procedure sought here is an example of the "more substantial intrusion" cautioned against in *Schmerber*, and hold that to permit the procedure would violate respondent's right to be secure in his person guaranteed by the Fourth Amendment.

## I

## A

At approximately 1 a. m. on July 18, 1982, Ralph E. Watkinson was closing his shop for the night. As he was locking the door, he observed someone armed with a gun coming toward him from across the street. Watkinson was also armed and when he drew his gun, the other person told him to freeze. Watkinson then fired at the other person, who returned his fire. Watkinson was hit in the legs, while the other individual, who appeared to be wounded in his left side, ran from the scene. The police arrived on the scene shortly thereafter, and Watkinson was taken by ambulance

to the emergency room of the Medical College of Virginia (MCV) Hospital.

Approximately 20 minutes later, police officers responding to another call found respondent eight blocks from where the earlier shooting occurred. Respondent was suffering from a gunshot wound to his left chest area and told the police that he had been shot when two individuals attempted to rob him. An ambulance took respondent to the MCV Hospital. Watkinson was still in the MCV emergency room and, when respondent entered that room, said "[t]hat's the man that shot me." App. 14. After an investigation, the police decided that respondent's story of having been himself the victim of a robbery was untrue and charged respondent with attempted robbery, malicious wounding, and two counts of using a firearm in the commission of a felony.

## B

The Commonwealth shortly thereafter moved in state court for an order directing respondent to undergo surgery to remove an object thought to be a bullet lodged under his left collarbone. The court conducted several evidentiary hearings on the motion. At the first hearing, the Commonwealth's expert testified that the surgical procedure would take 45 minutes and would involve a three to four percent chance of temporary nerve damage, a one percent chance of permanent nerve damage, and a one-tenth of one percent chance of death. At the second hearing, the expert testified that on reexamination of respondent, he discovered that the bullet was not "back inside close to the nerves and arteries," *id.*, at 52, as he originally had thought. Instead, he now believed the bullet to be located "just beneath the skin." *Id.*, at 57. He testified that the surgery would require an incision of only one and one-half centimeters (slightly more than one-half inch), could be performed under local anesthesia, and would result in "no danger on the basis that there's no general anesthesia employed." *Id.*, at 51.

The state trial judge granted the motion to compel surgery. Respondent petitioned the Virginia Supreme Court for a writ of prohibition and/or a writ of habeas corpus, both of which were denied. Respondent then brought an action in the United States District Court for the Eastern District of Virginia to enjoin the pending operation on Fourth Amendment grounds. The court refused to issue a preliminary injunction, holding that respondent's cause had little likelihood of success on the merits. 551 F. Supp. 247, 247–253 (1982).[1]

On October 18, 1982, just before the surgery was scheduled, the surgeon ordered that X rays be taken of respondent's chest. The X rays revealed that the bullet was in fact lodged two and one-half to three centimeters (approximately one inch) deep in muscular tissue in respondent's chest, substantially deeper than had been thought when the state court granted the motion to compel surgery. The surgeon now believed that a general anesthetic would be desirable for medical reasons.

Respondent moved the state trial court for a rehearing based on the new evidence. After holding an evidentiary hearing, the state trial court denied the rehearing, and the Virginia Supreme Court affirmed. Respondent then returned to federal court, where he moved to alter or amend the judgment previously entered against him. After an evidentiary hearing, the District Court enjoined the threatened surgery. 551 F. Supp., at 253–261 (supplemental opinion).[2]

---

[1] Respondent's action in the District Court was styled as a petition for habeas corpus and an action under 42 U. S. C. § 1983 for a preliminary injunction. Because the District Court denied the relief sought, it found it unnecessary to consider whether res judicata, see *Allen* v. *McCurry*, 449 U. S. 90 (1980), would bar consideration of the § 1983 claim. 551 F. Supp., at 252, n. 4.

[2] Respondent had moved to reopen the petition for habeas corpus, as well as to alter or amend the judgment. Petitioners moved to dismiss the petition for habeas on the ground that respondent was not at that time "in custody" for purposes of 28 U. S. C. § 2241. The District Court rejected this contention, holding that habeas was available because respondent was

A divided panel of the Court of Appeals for the Fourth Circuit affirmed. 717 F. 2d 888 (1983).[3] We granted certiorari, 466 U. S. 942 (1984), to consider whether a State may consistently with the Fourth Amendment compel a suspect to undergo surgery of this kind in a search for evidence of a crime.

## II

The Fourth Amendment protects "expectations of privacy," see *Katz* v. *United States*, 389 U. S. 347 (1967)—the individual's legitimate expectations that in certain places and at certain times he has "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States*, 277 U. S. 438,

---

objecting to a *future* custody that would take place when the operation was to be performed. 551 F. Supp., at 257–259. The Court of Appeals held that respondent's claim was cognizable only under § 1983. 717 F. 2d 888, 893 (1983). Respondent has not cross-petitioned for review of this holding, and it is therefore not before us.

[3] The Fourth Circuit held that *Allen* v. *McCurry, supra,* did not bar respondent's attempt to relitigate in federal court the same Fourth Amendment issues previously litigated in state court. The court agreed with the District Court's conclusion, see 551 F. Supp., at 258–259, that respondent had not had a full and fair opportunity to litigate in the state trial court. 717 F. 2d, at 895–899. Respondent filed his motion for rehearing in state court on October 18, the day he was informed of the changed circumstances regarding the removal of the bullet. On October 19, the state court ordered an evidentiary hearing to be held on October 21. The Court of Appeals was "satisfied from the record that counsel was not able, despite obviously diligent effort, to obtain an independent review of the medical record by outside physicians nor was he able to consult with the independent expert in anesthesiology in order to prepare a presentation on the risks of general anesthesia." *Id.,* at 897. Yet, despite the crucial nature of the medical evidence, the state court refused to grant respondent's repeated request for a continuance. Because "[t]he arbitrary truncation of preparation time deprived [respondent] of a fair opportunity to determine the crucial factors relevant to his claim and to obtain independent expert witnesses to testify about those factors," *id.,* at 898–899, the Court of Appeals refused to grant preclusive effect to the state court's findings. Petitioners do not challenge this ruling.

478 (1928) (Brandeis, J., dissenting). Putting to one side the procedural protections of the warrant requirement, the Fourth Amendment generally protects the "security" of "persons, houses, papers, and effects" against official intrusions up to the point where the community's need for evidence surmounts a specified standard, ordinarily "probable cause." Beyond this point, it is ordinarily justifiable for the community to demand that the individual give up some part of his interest in privacy and security to advance the community's vital interests in law enforcement; such a search is generally "reasonable" in the Amendment's terms.

A compelled surgical intrusion into an individual's body for evidence, however, implicates expectations of privacy and security of such magnitude that the intrusion may be "unreasonable" even if likely to produce evidence of a crime. In *Schmerber* v. *California*, 384 U. S. 757 (1966), we addressed a claim that the State had breached the Fourth Amendment's protection of the "right of the people to be secure in their *persons* . . . against unreasonable searches and seizures" (emphasis added) when it compelled an individual suspected of drunken driving to undergo a blood test. Schmerber had been arrested at a hospital while receiving treatment for injuries suffered when the automobile he was driving struck a tree. *Id.*, at 758. Despite Schmerber's objection, a police officer at the hospital had directed a physician to take a blood sample from him. Schmerber subsequently objected to the introduction at trial of evidence obtained as a result of the blood test.

The authorities in *Schmerber* clearly had probable cause to believe that he had been driving while intoxicated, *id.*, at 768, and to believe that a blood test would provide evidence that was exceptionally probative in confirming this belief. *Id.*, at 770. Because the case fell within the exigent-circumstances exception to the warrant requirement, no warrant was necessary. *Ibid.* The search was not more intrusive than reasonably necessary to accomplish its goals. Nonetheless,

Schmerber argued that the Fourth Amendment prohibited the authorities from intruding into his body to extract the blood that was needed as evidence.

*Schmerber* noted that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Id.*, at 767. Citing *Wolf* v. *Colorado*, 338 U. S. 25, 27 (1949), and *Mapp* v. *Ohio*, 367 U. S. 643 (1961), we observed that these values were "basic to a free society." We also noted that "[b]ecause we are dealing with intrusions into the human body rather than with state interferences with property relationships or private papers—'houses, papers, and effects'— we write on a clean slate." 384 U. S., at 767–768. The intrusion perhaps implicated Schmerber's most personal and deep-rooted expectations of privacy, and the Court recognized that Fourth Amendment analysis thus required a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable. The Fourth Amendment neither forbids nor permits all such intrusions; rather, the Amendment's "proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.*, at 768.

The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers. We believe that *Schmerber*, however, provides the appropriate framework of analysis for such cases.

*Schmerber* recognized that the ordinary requirements of the Fourth Amendment would be the threshold requirements for conducting this kind of surgical search and seizure. We noted the importance of probable cause. *Id.*, at 768–769.

And we pointed out: "Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. . . . The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Id.*, at 770.

Beyond these standards, *Schmerber*'s inquiry considered a number of other factors in determining the "reasonableness" of the blood test. A crucial factor in analyzing the magnitude of the intrusion in *Schmerber* is the extent to which the procedure may threaten the safety or health of the individual. "[F]or most people [a blood test] involves virtually no risk, trauma, or pain." *Id.*, at 771. Moreover, all reasonable medical precautions were taken and no unusual or untested procedures were employed in *Schmerber;* the procedure was performed "by a physician in a hospital environment according to accepted medical practices." *Ibid.* Notwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect.[4]

Another factor is the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity. Intruding into an individual's living room, see *Payton*

---

[4] Numerous courts have recognized the crucial importance of this factor. See, *e. g., Bowden* v. *State*, 256 Ark. 820, 823, 510 S. W. 2d 879, 882 (1974) (refusing to order surgery because of medical risk); *People* v. *Smith*, 80 Misc. 2d 210, 362 N. Y. S. 2d 909 (1974) (same); *State* v. *Allen*, 277 S. C. 595, 291 S. E. 2d 459 (1982) (same); see also 717 F. 2d 888, 900 (CA4 1983) (case below); *id.*, at 905–908 (Widener, J., dissenting); *United States* v. *Crowder*, 177 U. S. App. D. C. 165, 169, 543 F. 2d 312, 316 (1976) (en banc), cert. denied, 429 U. S. 1062 (1977); *State* v. *Overstreet*, 551 S. W. 2d 621, 628 (Mo. 1977) (en banc). See generally Note, 68 Marq. L. Rev. 130, 135 (1984) (discussing cases involving bodily intrusions); Note, 60 Notre Dame L. Rev. 149, 152–156 (1984) (same); Note, 55 Texas L. Rev. 147 (1976) (same); Mandell & Richardson, Surgical Search: Removing a Scar on the Fourth Amendment, 75 J. Crim. L. & C., No. 3, p. 525 (1984).

v. *New York*, 445 U. S. 573 (1980), eavesdropping upon an individual's telephone conversations, see *Katz* v. *United States*, 389 U. S., at 361, or forcing an individual to accompany police officers to the police station, see *Dunaway* v. *New York*, 442 U. S. 200 (1979), typically do not injure the physical person of the individual. Such intrusions do, however, damage the individual's sense of personal privacy and security and are thus subject to the Fourth Amendment's dictates. In noting that a blood test was "a commonplace in these days of periodic physical examinations," 384 U. S., at 771, *Schmerber* recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity.[5]

Weighed against these individual interests is the community's interest in fairly and accurately determining guilt or innocence. This interest is of course of great importance. We noted in *Schmerber* that a blood test is "a highly effective means of determining the degree to which a person is under the influence of alcohol." *Id.*, at 771. Moreover, there was "a clear indication that in fact [desired] evidence [would] be found" if the blood test were undertaken. *Id.*, at 770.

---

[5] See also *Schmerber*, 384 U.S, at 771, n. 13 (" 'The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors' ") (quoting *Breithaupt* v. *Abram*, 352 U. S. 432, 436 (1957)). The degree of intrusion in *Schmerber* was minimized as well by the fact that a blood test "involves virtually no risk, trauma, or pain," 384 U. S., at 771, and by the fact that the blood test was conducted "in a hospital environment according to accepted medical practices." *Ibid.* As such, the procedure in *Schmerber* contrasted sharply with the practice in *Rochin* v. *California*, 342 U. S. 165 (1952), in which police officers broke into a suspect's room, attempted to extract narcotics capsules he had put into his mouth, took him to a hospital, and directed that an emetic be administered to induce vomiting. *Id.*, at 166. *Rochin*, recognizing the individual's interest in "human dignity," *id.*, at 174, held the search and seizure unconstitutional under the Due Process Clause.

Especially given the difficulty of proving drunkenness by other means, these considerations showed that results of the blood test were of vital importance if the State were to enforce its drunken driving laws. In *Schmerber*, we concluded that this state interest was sufficient to justify the intrusion, and the compelled blood test was thus "reasonable" for Fourth Amendment purposes.

## III

Applying the *Schmerber* balancing test in this case, we believe that the Court of Appeals reached the correct result. The Commonwealth plainly had probable cause to conduct the search. In addition, all parties apparently agree that respondent has had a full measure of procedural protections and has been able fully to litigate the difficult medical and legal questions necessarily involved in analyzing the reasonableness of a surgical incision of this magnitude.[6] Our inquiry therefore must focus on the extent of the intrusion on respondent's privacy interests and on the State's need for the evidence.

The threats to the health or safety of respondent posed by the surgery are the subject of sharp dispute between the parties. Before the new revelations of October 18, the District Court found that the procedure could be carried out "with virtually no risk to [respondent]." 551 F. Supp., at 252. On rehearing, however, with new evidence before it, the District Court held that "the risks previously involved have increased in magnitude even as new risks are being added." *Id.*, at 260.

The Court of Appeals examined the medical evidence in the record and found that respondent would suffer some risks

---

[6] Because the State has afforded respondent the benefit of a full adversary presentation and appellate review, we do not reach the question whether the State may compel a suspect to undergo a surgical search of this magnitude for evidence absent such special procedural protections. Cf. *United States* v. *Crowder, supra*, at 169, 543 F. 2d, at 316; *State* v. *Lawson*, 187 N. J. Super. 25, 28–29, 453 A. 2d 556, 558 (App. Div. 1982).

associated with the surgical procedure.[7] One surgeon had testified that the difficulty of discovering the exact location of the bullet "could require extensive probing and retracting of the muscle tissue," carrying with it "the concomitant risks of injury to the muscle as well as injury to the nerves, blood vessels and other tissue in the chest and pleural cavity." 717 F. 2d, at 900. The court further noted that "the greater intrusion and the larger incisions increase the risks of infection." *Ibid.* Moreover, there was conflict in the testimony concerning the nature and the scope of the operation. One surgeon stated that it would take 15–20 minutes, while another predicted the procedure could take up to two and one-half hours. *Ibid.* The court properly took the resulting uncertainty about the medical risks into account.[8]

Both lower courts in this case believed that the proposed surgery, which for purely medical reasons required the use of a general anesthetic,[9] would be an "extensive" intrusion on respondent's personal privacy and bodily integrity. *Ibid.*

---

[7] The Court of Appeals concluded, however, that "the specific physical risks from putting [respondent] under general anesthesia may therefore be considered minimal." 717 F. 2d, at 900. Testimony had shown that "the general risks of harm or death from general anesthesia are quite low, and that [respondent] was in the statistical group of persons with the lowest risk of injury from general anesthesia." *Ibid.*

[8] One expert testified that this would be "minor" surgery. See App. 99. The question whether the surgery is to be characterized in medical terms as "major" or "minor" is not controlling. We agree with the Court of Appeals and the District Court in this case that "there is no reason to suppose that the definition of a medical term of art should coincide with the parameters of a constitutional standard." 551 F. Supp., at 260 (quoted at 717 F. 2d, at 901); accord, *State* v. *Overstreet*, 551 S. W. 2d, at 628. This does not mean that the application of medical concepts in such cases is to be ignored. However, no specific medical categorization can control the multifaceted legal inquiry that the court must undertake.

[9] Somewhat different issues would be raised if the use of a general anesthetic became necessary because of the patient's refusal to cooperate. Cf. *State* v. *Lawson, supra.*

When conducted with the consent of the patient, surgery requiring general anesthesia is not necessarily demeaning or intrusive. In such a case, the surgeon is carrying out the patient's own will concerning the patient's body and the patient's right to privacy is therefore preserved. In this case, however, the Court of Appeals noted that the Commonwealth proposes to take control of respondent's body, to "drug this citizen—not yet convicted of a criminal offense—with narcotics and barbiturates into a state of unconsciousness," *id.*, at 901, and then to search beneath his skin for evidence of a crime. This kind of surgery involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin.

The other part of the balance concerns the Commonwealth's need to intrude into respondent's body to retrieve the bullet. The Commonwealth claims to need the bullet to demonstrate that it was fired from Watkinson's gun, which in turn would show that respondent was the robber who confronted Watkinson. However, although we recognize the difficulty of making determinations in advance as to the strength of the case against respondent, petitioners' assertions of a compelling need for the bullet are hardly persuasive. The very circumstances relied on in this case to demonstrate probable cause to believe that evidence will be found tend to vitiate the Commonwealth's need to compel respondent to undergo surgery. The Commonwealth has available substantial additional evidence that respondent was the individual who accosted Watkinson on the night of the robbery. No party in this case suggests that Watkinson's entirely spontaneous identification of respondent at the hospital would be inadmissible. In addition, petitioners can no doubt prove that Watkinson was found a few blocks from Watkinson's store shortly after the incident took place. And petitioners can certainly show that the location of the bullet (under respondent's left collarbone) seems to correlate with Watkinson's report that the robber "jerked" to the left. App. 13. The fact that the

Commonwealth has available such substantial evidence of the origin of the bullet restricts the need for the Commonwealth to compel respondent to undergo the contemplated surgery.[10]

In weighing the various factors in this case, we therefore reach the same conclusion as the courts below. The operation sought will intrude substantially on respondent's protected interests. The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; the very uncertainty militates against finding the operation to be "reasonable." In addition, the intrusion on respondent's privacy interests entailed by the operation can only be characterized as severe. On the other hand, although the bullet may turn out to be useful to the Commonwealth in prosecuting respondent, the Commonwealth has failed to demonstrate a compelling need for it. We believe that in these circumstances the Commonwealth has failed to demonstrate that it would be "reasonable" under the terms of the Fourth Amendment to search for evidence of this crime by means of the contemplated surgery.

---

[10] There are also some questions concerning the probative value of the bullet, even if it could be retrieved. The evidentiary value of the bullet depends on a comparison between markings, if any, on the bullet in respondent's shoulder and markings, if any, found on a test bullet that the police could fire from Watkinson's gun. However, the record supports some doubt whether this kind of comparison is possible. This is because the bullet's markings may have been corroded in the time that the bullet has been in respondent's shoulder, thus making it useless for comparison purposes. See 717 F. 2d, at 901, n. 15. In addition, respondent argues that any given gun may be incapable of firing bullets that have a consistent set of markings. See Joling, An Overview of Firearms Identification Evidence for Attorneys I: Salient Features of Firearms Evidence, 26 J. Forensic Sci. 153, 154 (1981). The record is devoid of any evidence that the police have attempted to test-fire Watkinson's gun, and there thus remains the additional possibility that a comparison of bullets is impossible because Watkinson's gun does not consistently fire bullets with the same markings. However, because the courts below made no findings on this point, we hesitate to give it significant weight in our analysis.

## IV

The Fourth Amendment is a vital safeguard of the right of the citizen to be free from unreasonable governmental intrusions into any area in which he has a reasonable expectation of privacy. Where the Court has found a lesser expectation of privacy, see, *e. g.*, *Rakas* v. *Illinois*, 439 U. S. 128 (1978); *South Dakota* v. *Opperman*, 428 U. S. 364 (1976), or where the search involves a minimal intrusion on privacy interests, see, *e. g.*, *United States* v. *Hensley*, 469 U. S. 221 (1985); *Dunaway* v. *New York*, 442 U. S., at 210–211; *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 880 (1975); *Adams* v. *Williams*, 407 U. S. 143 (1972); *Terry* v. *Ohio*, 392 U. S. 1 (1968), the Court has held that the Fourth Amendment's protections are correspondingly less stringent. Conversely, however, the Fourth Amendment's command that searches be "reasonable" requires that when the State seeks to intrude upon an area in which our society recognizes a significantly heightened privacy interest, a more substantial justification is required to make the search "reasonable." Applying these principles, we hold that the proposed search in this case would be "unreasonable" under the Fourth Amendment.

*Affirmed.*

JUSTICE BLACKMUN and JUSTICE REHNQUIST concur in the judgment.

CHIEF JUSTICE BURGER, concurring.

I join because I read the Court's opinion as not preventing detention of an individual if there are reasonable grounds to believe that natural bodily functions will disclose the presence of contraband materials secreted internally.