**UNITED STATES of America Plaintiff**

v.

**Jose Antonio GARCIA–ORTIZ Defendant**

**No. CRIM.01–111 DRD.**

United States District Court, D. Puerto Rico.

April 29, 2003.

---

H.S. Garcia, U.S. Attorney, Vernon B. Miles, Assistant U.S. Attorney, San Juan, PR, for Plaintiff.

Linda George, Esq., Hackensack, NJ, for Defendant.

## OPINION AND ORDER

GELPI, United States Magistrate Judge.

Presently before the Court is the Government's *Motion to Remove Bullet from Defendant* José Antonio García Ortiz. (Docket No. 75). After careful review of all the relevant evidence and applicable jurisprudence, the Court concludes that the Government has failed to demonstrate the proposed procedure's unequivocal safety, thus warranting the Court's **DENIAL** of its motion for a court-ordered surgical procedure.

### I. Factual and Procedural Background

The instant case arises out of an attempted robbery at Ralph's Food Warehouse, located in Gurabo, Puerto Rico, on December 9, 2000. While on their way to make a deposit for the supermarket, the store manager and a security guard were assaulted by a group of individuals. An ensuing shootout resulted in the death of one of the assailants, and the wounding of the security guard and a second perpetrator, who fled in a stolen car with the store's cash.

Later that same day, local authorities discovered the assailants' vehicle, which two days later was turned over to the F.B.I., San Juan Division. A subsequent inspection of the vehicle revealed a blood stain of which samples were taken into evidence.

Some time after the robbery, the government received word from a yet unidentified source, to the effect that defendant José Antonio Garcia Ortiz had been one of the assailants. *See* ¶ 8 of Affidavit in Support of Criminal Complaint. (Docket No. 1). Subsequently, on December 20, 2000, the Government served a grand jury subpoena on the defendant compelling him to provide blood, hair and saliva samples, as

well as to be fingerprinted. The following day, the defendant, via counsel, consented to the procedures as well as a physical examination and x-ray. The latter revealed what appeared to be a bullet in the defendant's upper back.

On February 28, 2001, after completion of all the relevant analyses of the samples provided, a warrant was issued for the defendant's arrest. (Docket No. 2). He was subsequently indicted by a grand jury for violations of 18 U.S.C. § 1951(a) and § 2, 18 U.S.C. § 924(c)(1)(A) and (2), and 18 U.S.C. § 924(j). (Docket No. 8).

On February 5, 2002, *almost a year after his arrest*, the Government moved to have the defendant examined by a physician to determine if the bullet could be removed from his back. (Docket No. 58). Said request was granted (Docket No. 68), and the scheduled examination was performed by the Government's doctor, Dr. Felix S. Vilella Suau, on or about April 15, 2002. *See ¶5 of Government's Motion for Removal of Bullet from Defendant* (Docket No. 75). On July 10, 2002, the Government filed its *Motion for Removal of Bullet from Defendant*, which is presently before the Court. (Docket No. 75). The Defendant, in turn, subsequently filed an opposition to said motion on September 6, 2002. (Docket No. 79).

An evidentiary hearing on the matter was held before the undersigned on March 4, 2003. (Docket No. 104). The parties subsequently filed simultaneous supplemental memoranda. (Docket Nos. 105 and 106).

## II. *Legal Analysis*

The seminal case involving court ordered surgery on a criminal defendant is *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), where a defendant in Virginia state court, charged with malicious wounding and attempted robbery, was ordered to undergo surgery to remove a bullet lodged under his left collarbone. The defendant alleged that such an intrusion would violate his Fourth Amendment rights. The State, however, argued that the bullet would provide evidence of the respondent's guilt or innocence.

After several unsuccessful attempts to enjoin the court-ordered surgery, the defendant ultimately obtained an order from a federal district court enjoining the surgical procedure. The district court ruling was affirmed by the Court of Appeals for the Fourth Circuit. *See Lee v. Winston,* 717 F.2d 888 (4th Cir.1983). Upon review, the Supreme Court upheld the ruling, holding that the proposed surgery would violate the respondent's rights to be secure in his person and that the search would be "unreasonable" under the Fourth Amendment. *Id.,* 470 U.S. at 757–766, 105 S.Ct. 1611.

In reaching its conclusion, the Supreme Court adopted the framework set forth in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *See Winston, supra,* at 760, 105 S.Ct. 1611. Accordingly, a Court faced with a motion such as the present one must consider three key factors, beyond the probable cause threshold. First, the Court must determine "the extent to which the procedure may threaten the safety or health of the individual"[1]. This first criteria is a result of earlier jurisprudence which considered the proposed procedure's threat to the defendant's health[2]. *Id.,* at 761, 105

---

[1] "Notwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable if it endangers the life or health of a suspect". *Winston v. Lee,* 470 U.S. at 761, 105 S.Ct. 1611.

[2] For pre-*Winston* cases where the surgical procedure was shown to pose no considerable

S.Ct. 1611. Second, a Court must consider the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity. *Id.*, Lastly, the Court must consider whether the community's interests in fairly and accurately determining guilt or innocence outweigh the defendant's individual pleas. *Id.*, at 762, 105 S.Ct. 1611. The Court in *Winston* added a fourth factor to be examined, to wit, that the Government show a "compelling need for [removal of] the bullet" before the surgery is ordered. *Id.*, at 765, 105 S.Ct. 1611.

In the present case, the government seeks to have the bullet lodged in the defendant's shoulder removed, alleging that the projectile would provide direct evidence relating to the defendant's involvement in the robbery. The government expects to match the bullet's markings with the security guard's weapon. *See* ¶ 2 of *Government's Reply to the Defendant's Opposition to Removal of Bullet from the Defendant* (*See* Docket No. 95).

The controversy at bar is whether the proposed surgical procedure poses any threat to the defendant's health. An evidentiary hearing to address the possible health risks associated with the bullet's removal was held on March 4, 2003, during which both parties presented expert medical testimony in support of their contentions. (*See* Docket No. 103, 104). The same is summarized below.

## III. Evidentiary Hearing

*Testimony of Dr. Felix S. Vilella Suau, M.D.*

The Government alleges that any intrusion to the defendant's body would result in a minimal risk to his health, as evidenced by the testimony of Dr. Felix S. Vilella Suau. Having performed a physical examination of the defendant almost one year prior to the evidentiary hearing, Dr. Vilella testified that the bullet was located under the skin's fatty tissue, and was easily palpable. *See* Evidentiary Hearing Transcript ("Tr."), p. 6, 11–12 (Docket No. 104). Dr. Vilella further testified that the proposed surgery would require only local anesthesia, with a duration of approximately twenty (20) minutes, and that the risks associated with the operation would be minimal[3]. (Tr. 12).

*Testimony of Dr. Kenneth G. Swan, M.D.*

The defendant claims that the court-ordered procedure could result in numerous health hazards such as adverse reactions to anesthesia, hemorrhaging, blood loss or infection, penetration of the chest

risk to the defendant, and thus granted, *see, e.g., Hughes v. United States*, 429 A.2d 1339 (D.C.App.1981) (operation just under the skin of a murder suspect was permitted over the defendant's objections); *United States v. Crowder*, 543 F.2d 312 (C.A.D.C.1976) (minor wrist surgery constitutionally permissible); and *Doe v. State*, 409 So.2d 25 (Fla.App.1981) (surgery to remove bullet from below the defendant's skin did not pose a sufficient risk to warrant denial of request).

For instances in which courts denied such requests since the proposed surgery was found to present a possible risk to the defendant, *see, e.g., State v. Allen*, 277 S.C. 595, 291 S.E.2d 459 (1982) (surgery to remove bullet from beneath a defendant's rib was too severe to be permitted as reasonable under the Fourth Amendment); *Bowden v. State*, 256 Ark. 820, 510 S.W.2d 879 (1974) (surgery to remove a bullet from a defendant's spinal canal was deemed improper because of the dangers posed to the defendant); *People v. Smith*, 80 Misc.2d 210, 362 N.Y.S.2d 909 (N.Y.1974) (surgery to remove bullet from a defendant's back impermissible due to dangers posed).

3. Dr. Vilella specifically stated that the only tissue damage would result in a scar, and that, because "there are no major vessels or major nerves" in the area, there would be no nerve injury or nerve damage. *See* Evidentiary Hearing Transcript, Docket No. 104, p. 12.

cavity, respiratory compromise, injury to the spine, spinal cord, or other nerves, and/or death. *See* ¶ 4 of *Defendant's Supplemental Opposition to Government's Motion for Court Ordered Surgical Procedure.* (Docket No. 93, p. 2). In support of his claim, the defendant presented the testimony of Dr. Kenneth Swan[4]. Dr. Swan emphatically stressed the proposed procedure's contraindications. According to Dr. Swan, the bullet is lodged deep below the skin's surface, and any procedure to remove it would require the defendant to be placed "in the prone position" (laying face down), which would in turn risk pulmonary function and necessitate the use of general anesthesia. (Tr. 47). Dr. Swan further testified that such a procedure could actually embed the object deeper into the body. (Tr. 48). According to Dr. Swan, the bullet is deformed and has a fish hook-like barb at one end. (Tr. 49). In Dr. Swan's opinion, the bullet's shape would complicate the procedure requiring "a lot more dissection," resulting in increased difficulty to remove the bullet. (Tr., at 50).

## IV. *Analysis*

■ Dr. Vilella concludes that the removal of the bullet from the defendant's shoulder, purportedly over two years after the initial wound, would pose no significant health risk to the defendant. Nevertheless, the detailed testimony of Dr. Swan has established sufficient genuine doubt to militate against the Court's approval of the procedure.

Dr. Vilella's conclusion that the bullet is located in the fatty tissue of defendant's skin is the basis for his assessment of the procedure's safety. Nonetheless, Dr. Swan testified to the contrary. According

to Dr. Swan's testimony, the fact that the bullet is immobile, that there is no inflammatory response around the area, and, that the temperature around the surrounding skin is the same as that of the skin overlying the object, are indicators that the bullet is embedded deeper inside the skin's surface, possibly in some muscle tissue[5]. (Tr. 46, 59, 64). Moreover, Dr. Vilella rests his assertions on a physical examination performed on the defendant almost *one year before* the evidentiary hearing, while Dr. Swan's testimony was based on an examination conducted the day previous to the hearing. These factors, compounded with the statements from both medical witnesses acknowledging the possibility of the projectile's migration (*see* Tr. 19 and 53), shed doubt as to Dr. Vilella's assurance of the bullet's location, which, in turn, would complicate matters even more when considering the bullet's physical position.

During the evidentiary hearing, Dr. Swan further testified that the bullet was misshapen and deformed. (Tr. 49 and 51). According to Dr. Swan, the bullet's surface was irregularly shaped with "projections coming out of it", deviating substantially from a bullet's regular parabolic configuration. (Tr. 51). One projection in particular, described by Dr. Swan as resembling a fish hook or spur, appears to significantly increase the potential risks involved in removing the projectile. It is Dr. Swan's expert opinion that the bullet's projections could have caused it to latch on to the surrounding tissue, requiring increased dissection. (Tr. 49–50 and 64). Moreover, if the bullet were lodged in muscle tissue, as Dr. Swan has stated, the procedure

---

4. Dr. Swan's *curriculum vitae* is attached to the defendant's *Supplemental Opposition* as Exhibit A (Docket No. 93).

5. Dr. Swan also testified that ·the bullet should only be removed if it is "right under the skin", "mobile", and "swimming in a sea of fluid which in fact is puss." (Tr. 61).

would result in possible damage to the surrounding area. While the government did address the presence of the so-called spur, it did so just to emphasize the possibility of *performing* the surgery, not the hazards implied by the same. (Tr. 64).

Further dispute surrounds the type of anesthesia the procedure at issue would necessitate. Dr. Vilella testified that only local anesthesia would be needed, although he provided no in-depth justification other than the procedure's local nature. (Tr. 12). Dr. Swan, on the other hand, testified that based on the need to place the patient in the "prone position", the resulting intervention, and the pulmonary risks such a position entails, general anesthesia would be required. (Tr. 47). Although no definite answer as to exactly which type of anesthesia is appropriate has been given, Dr. Swan's testimony does give the Court reason to pause. In *Winston*, the use of general anesthesia was determined to infringe on a defendant's dignitary rights. Hence, if the use of general anesthesia were to be called for, the procedure would be unwarranted.[6]

### V. *Conclusion*

Pursuant to *Winston v. Lee*, this Court must conclude that the proposed procedure poses no significant risk to the defendant's health prior to ordering surgery on the defendant. The procedure's viability, in and of itself, does not suffice. More so, the Court can not take its responsibility under *Winston* lightly. Weighing the defendant's privacy and security interests against society's interest in conducting the procedure is a delicate task which merits a comprehensive analysis. *Id.*, at 766, 105 S.Ct. 1611.

As in *Winston, supra,* the medical facts in the instant case are sufficiently disputed[7] to question the safety of the proposed surgery, and thus, warrant the denial of the Government's *Motion to Remove Bullet From Defendant.* (Docket No. 75).

**WHEREFORE,** the Court hereby **DENIES** the *Government's Motion to Remove Bullet from Defendant.* (Docket No. 75).

**SO ORDERED.**

---

6. "This kind of surgery involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin." *Winston v. Lee,* 470 U.S. at 765, 105 S.Ct. 1611.

7. "The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; the very uncertainty militates against finding the operation to be 'reasonable'." *Winston v. Lee,* 470 U.S. at 766, 105 S.Ct. 1611.