IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 20, 2014

## STATE OF TENNESSEE v. BOYCE TURNER

**Appeal from the Criminal Court for Washington County**
**No. 37856     Stacy L. Street, Judge**

---

**No. E2013-02304-CCA-R3-CD-FILED-DECEMBER 30, 2014**

---

The Defendant, Boyce Turner, was indicted by the Washington County Grand Jury on two counts of driving under the influence ("DUI"), two counts of DUI 4th offense, evading arrest, resisting arrest, and driving on a revoked license. The Defendant refused law enforcement's request to submit to a blood test to determine his blood alcohol content, and his blood was taken, without a warrant and over his objections, pursuant to Tennessee Code Annotated section 55-10-406(f)(2) (2012). The trial court subsequently granted the Defendant's motion to suppress evidence of his blood alcohol content test, concluding that the Defendant's Fourth Amendment rights were violated. In this appeal, the State argues that the trial court erred in granting the Defendant's motion to suppress because the Defendant consented to the test by driving on the roads in Tennessee and exigent circumstances justified the warrantless search. Upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and DAVID A. PATTERSON, SP. J., joined.

Donald E. Spurrell, Johnson City, Tennessee, for the Defendant-Appellee, Boyce Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn and John H. Bledsoe, Assistant Attorneys General; Anthony Clark, District Attorney General; and Kelly Lowe, Assistant District Attorney General, for the Appellant, State of Tennessee.

## OPINION

At the Defendant's September 13, 2013 suppression hearing, Trooper Jonathan Street of the Tennessee Highway Patrol, testified that at approximately 3:00 a.m. on February 10, 2012, he observed a Dodge pickup truck, which he recognized as belonging to the Defendant.

Trooper Street recognized the truck because he had been involved in a previous arrest of the Defendant for "evading arrest, a DUI stop, cocaine charge, [and] a couple of other things," and he recalled that the Defendant was convicted of DUI. Trooper Street ran the truck's tag number through NCIC and asked dispatch to check the status of the Defendant's license.

After confirming that the Defendant's license had been revoked for DUI, Trooper Street attempted to initiate a traffic stop of the Defendant in front of a restaurant parking lot. As the Defendant turned into the parking lot, his truck door "immediately flew open," and the Defendant "looked back at [Trooper Street] and made a running motion towards downtown where the bars are located." Trooper Street pursued the Defendant on foot and gave verbal commands to stop. He chased the Defendant for about "a hundred meters" before catching him and tackling him to the ground. A citizen saw Trooper Street struggling with the Defendant on the ground and asked if he needed help. Trooper Street asked the citizen to "call 911, tell them to send me a city officer . . . . [T]here's no other troopers around." Trooper Street testified that the closest state trooper was Sergeant Appleba, who was a 30-minute drive away.

Trooper Street used pepper spray to gain control over the Defendant and handcuff him. Officer Mike Butler of the Johnson City Police Department helped Trooper Street escort the Defendant back to the patrol car. Trooper Street recalled that the Defendant smelled of alcohol and was "agitated" and "belligerent"all the way back to the patrol car. After Trooper Street secured the Defendant in his patrol car, he secured the scene and called dispatch to let them know what had happened. Per highway patrol policy, Trooper Street had to call his supervisor because he had used chemical agents to subdue the Defendant but could not recall whether his supervisor came to the scene or the hospital. Trooper Street also had to have the Defendant's vehicle towed before leaving the scene. He estimated that he was at the scene for 30 to 45 minutes before being able to leave.

Trooper Street took the Defendant to the Johnson City Medical Center, about five to seven minutes away, for medical personnel to wash out and check his eyes. Trooper Street stated that due to the distance of the hospital, he decided to take the Defendant rather than wait on an ambulance. While being treated at the hospital, the Defendant continued to be "very unruly." Trooper Street stated, "[T]here was no way I was going to leave him there unattended due to his previous behavior." After a nurse washed out the Defendant's eyes, Trooper Street directed that a blood sample be taken from the Defendant. Trooper Street estimated that approximately an hour had passed since the initial traffic stop.

Trooper Street testified that in February 2012, there were "no procedures in place" for the Tennessee Highway Patrol to easily obtain DUI search warrants. He explained, "[T]here was no form set up. There was no simple way of going about it." Trooper Street testified

that because of the time of the stop and lack of procedures, it would have been "extreme[ly] difficult[]" to obtain a search warrant in this case. He opined that it would have taken "several hours [to get a warrant] due to what all had taken place before," and explained:

> It just wasn't a . . . typical DUI stop, if you can call one that, of where you stop the car, go directly through field sobriety and then go that route it was due to the pepper spray, the foot chase, me being by myself, it just really changed the whole scenario.

On cross examination, Trooper Street agreed that he had subdued and arrested the Defendant within 10 minutes of his initial stop. He further agreed that Johnson City police officers responded to and assisted him at the scene. When asked whether he could have asked Johnson City police officers to "guard" the Defendant for him while he attended to other business, Trooper Street stated, "[A]s highway patrol[,] we do not turn our prisoners over to another agency . . . . I would have been in violation [of Tennessee Highway Patrol policies]." He agreed, however, that his supervisor could have guarded the Defendant while he obtained a search warrant. He reiterated that there was no policy in place at the time to obtain a warrant. Trooper Street stated that since the Defendant's arrest, highway patrol procedures have changed to allow troopers to easily obtain DUI search warrants. He explained, "Now, . . . I'[m] very capable of [obtaining a DUI search warrant]. We have judges on call. We have DA's on call. We have forms. At that time[,] none of this was in place." He stated that under current procedures, he calls the prosecutor on call to determine whether he needs to proceed with a search warrant, has the prosecutor read over the search warrant to ensure it is correct, and then contacts a judge to have the warrant signed. He agreed that he made no attempt to obtain a warrant but stated that he believed he was working under the law at that time in "good faith."

The Defendant agreed that he initially fled from Trooper Street after being pulled over but insisted that he stopped fleeing and did not resist arrest. After he stopped, Trooper Street tackled him and "was trying to grab [him] and put [his] hands behind [his] back." The Defendant claimed he was not resisting but it sounded "like it was a scuffle" because Trooper Street was trying to secure the Defendant. A passerby asked Trooper Street if he needed help, and Trooper Street told him to call 911. Trooper Street then used pepper spray on the Defendant and handcuffed him. Trooper Street walked the Defendant back to the patrol car and called another trooper to the scene. The Defendant claimed that the trooper never asked him to perform any field sobriety tests. He sat in the patrol car for approximately 30 minutes before Trooper Street took him to the hospital.

At the conclusion of the hearing, the trial court made the following oral findings of fact:

Trooper Street saw a truck which he recognized from the previous stop pass[] him on the roadway. Based upon that observation he calls in to another trooper . . . and confirms that the tag number on the truck belongs to [the Defendant], and further confirms that there's a driving on revoked license and there are no restrictive means by which [the Defendant] can drive, i.e. a restricted driver[']s license of any sort. At that time then Trooper Street initiates the stop of the vehicle. The vehicle stops almost immediately . . . at which point [the Defendant] exits the vehicle and . . . left the scene and had to be arrested and brought back to the scene. . . . We have a video tape and . . . the brunt of this video . . . shows that period of time. It shows another number of officers finally come and assist Trooper Street at the scene from the Johnson City Police Department. The decision is made by Trooper Street to seek medical attention for [the Defendant] who is then taken to the Johnson City Medical Center after a period of time. The court does not see any indication of field sobriety tests given at the scene. . . . [I]t appears that while at the hospital pursuant to the statu[t]e at the time and because of a prior DUI there was a – a non-consensual blood draw of [the Defendant], of which the court does not know the results.

Relying on Missouri v. McNeely, 133 S. Ct. 1552 (2013), the court reasoned that there must be "unique and extenuating circumstances" to draw the Defendant's blood without consent or a warrant and concluded that nothing in the record established exigent circumstances in this case. Accordingly, the trial court granted the Defendant's motion to suppress evidence of his blood alcohol content test.

Following the suppression of this evidence, the State filed a timely notice of appeal to this court.

**ANALYSIS**

In this appeal, the State argues that the trial court improperly suppressed the results of the Defendant's blood alcohol content test because the warrantless draw of the Defendant's blood was justified by consent and exigent circumstances. The Defendant responds that the trial court properly suppressed the test results.[1]

---

[1] In his motion to suppress evidence, the Defendant also argued that Trooper Street's traffic stop was not supported by reasonable suspicion, and consequently, any evidence obtained as a result of the stop, including the Defendant's blood alcohol content test, should be suppressed. At the suppression hearing, the Defendant informed the trial court that he wished to abandon that issue. Notwithstanding the Defendant's
(continued...)

As a controlling issue in this case, we must first address our jurisdiction to hear this appeal. Following the trial court's grant of the Defendant's motion to suppress, the State filed a timely notice of appeal under Rule 3 of the Tennessee Rules of Appellate Procedure. However, the Defendant's case was not actually dismissed as a result of the trial court's order. Accordingly, as recognized by the State, the State should have pursued an interlocutory appeal under Rule 9 or an extraordinary appeal under Rule 10. Tenn. R. App. P. 9(a)(1), (3); 10(a); see State v. Meeks, 262 S.W.3d 710 (Tenn. 2008). The State asks this court to consider its improperly filed Rule 3 appeal as a Rule 10 extraordinary appeal. See State v. Norris, 47 S.W.3d 457, (Tenn. Crim. App. 2000) ("[T]his court may treat an improperly filed Rule 3 appeal as a Rule 10 extraordinary appeal.") (citations omitted).

Rule 10 of the Tennessee Rules of Appellate Procedure provides that an extraordinary appeal may be sought, at the sole discretion of the appellate court, "if the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review, or . . . if necessary for complete determination of the action on appeal as otherwise provided in these rules." To obtain an extraordinary appeal, the appealing party must establish that: (1) "the ruling of the court below represents a fundamental illegality"; (2) "the ruling constitutes a failure to proceed according to the essential requirements of the law"; (3) "the ruling is tantamount to the denial of either party of a day in court"; (4) the action of the trial judge was without legal authority"; (5) "the action of the trial judge constituted a plain and palpable abuse of discretion"; or (6) "either party has lost a right or interest that may never be recaptured." State v. Willoughby, 594 S.W.2d 388, 392 (Tenn. 1980) (concluding that the rules applicable for the common law writ of certiorari are also applicable to application for extraordinary appeal under Rule 10).

This court has held that "a suppression order that eliminates any reasonable probability of a successful prosecution provides a basis for an interlocutory appeal under [Rule 9] or an extraordinary appeal under [Rule 10]." Meeks, 262 S.W.3d at 720. The court explained,

> When an order suppresses or excludes evidence and thereby eliminates the heart of the State's case, requiring the State to proceed to trial without the suppressed evidence could result in irreparable injury to the public's interest if the accused is acquitted. In that circumstance, the State could not obtain meaningful appellate review of the suppression order because the Double

---

[1](...continued)
waiver, the trial court ruled on the issue and concluded that there was probable cause to support the stop. The Defendant did not raise this issue again on appeal. Accordingly, we do not address it.

Jeopardy Clauses of the federal and state constitutions would prevent the State from trying the accused a second time. . . .

A second justification for granting [interlocutory or extraordinary] appeals from suppression orders arises from the fact that the legal principles relating to searches and seizures and interrogations fluctuate and are heavily fact-dependent. Giving the parties an opportunity for immediate appellate review of suppression orders not only affords them with a chance to obtain review of questionable rulings, but it also decreases the repetition of similar errors by law enforcement officials before the challenged conduct can be reviewed by the courts pursuant to an appeal as of right.

Id. at 720-71 (internal citations and footnotes omitted). In the present case, the suppression of the Defendant's blood test results essentially foreclosed any probability of a successful prosecution as the Defendant did not perform any field sobriety tests. Requiring the State to proceed to trial without the blood test results could result in irreparable injury to the public's interest if the Defendant is acquitted, and the State would not be able to obtain meaningful appellate review due to the double jeopardy concerns. Accordingly, we conclude that the State has met the requirements for an extraordinary appeal and will consider the State's improperly filed Rule 3 appeal as a Rule 10 extraordinary appeal. We turn to the merits of the State's argument.

It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)). "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). The State bears the burden to establish by a preponderance of the evidence that a warrantless search or seizure is constitutional. See, e.g., State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998).

There is no question that the drawing of the Defendant's blood constituted a search implicating Fourth Amendment protections. "Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013) (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)); see also Skinner v. Railway Labor Executives' Assn., 489 U.S. 602 (1989). Thus, "the importance of requiring authorization by a 'neutral and detached magistrate' before allowing a law enforcement officer to 'invade another's body in search of evidence of guilt is indisputable and great.'" Id. (quoting Schmerber v. California, 384 U.S. 757, 770 (1966)). As noted, however, the warrant requirement is subject to exceptions. These recognized exceptions include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . . consent to search." State v. Charles A. Kennedy, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *6 (Tenn. Crim. App. Oct. 3, 2014) (quoting State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2002)). At issue here are consent to search and exigent circumstances.

**I. Consent.** The State first argues that the Defendant, pursuant to Tennessee's implied consent law, consented to the warrantless blood draw by driving on the roadways in Tennessee. Under the implied consent statute, anyone who drives a car in this state "is deemed to have given consent to a test or tests for the purposes of determining the alcoholic content of that person's blood[.]" T.C.A. § 55-10-406(a) (2012). The statute further provides that a driver may generally refuse to consent to such a test and be subject to a violation of the implied consent law. See id. § 55-10-406(a)(4)(A).[2] However, section (f) delineates

_____

[2] The implied consent statute has since been revised, and this provision is now codified at Tennessee
(continued...)

exceptions to the driver's statutory right to refuse consent, which includes where a law enforcement officer has probable cause to believe that the driver was driving under the influence and has previously been convicted of a DUI. See id. § 55-10-406(f)(2).[3] Based on these provisions, the State avers that because the arresting officer had probable cause to believe that the Defendant had been driving under the influence and that he had prior DUI convictions, the Defendant had given irrevocable consent, sufficient for Fourth Amendment purposes, to submit to a blood test.

Despite extensive briefing of the issue on appeal, the State did not raise this issue at the suppression hearing and the trial court did not consider it. "When an issue is raised for the first time on appeal, it is typically waived." State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); see also, e.g., Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Simpson v. Frontier Community Credit Union, 810 S.W.2d 147, 153 (Tenn. 1991) ("[I]ssues not raised in the trial court cannot be raised for the first time on appeal.") (citations omitted); Charles A. Kennedy, 2014 WL 4953586, at *10 ("Because the State failed to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it."). Accordingly, we conclude that the State has waived our consideration of this issue and decline to address it.

**II. Exigent Circumstances.** The State also argues that the warrantless blood draw in this case was justified by exigent circumstances. As noted, "[o]ne well-recognized exception [to the warrant requirement] . . . applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." McNeely, 133 S. Ct. at 1558(quoting Kentucky v. King, 131 S. Ct. 1849, 1856 (2011)). "A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search," including, as relevant here, the prevention of "the imminent destruction of evidence." Id. (citations omitted). "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of the circumstances." Id. at 1159 (citing Brigham City v. Stuart, 547 U.S. 398, 406 (2006); Illinois v. McArthur, 531 U.S. 326, 331 (2001); Richards v. Wisconsin, 520 U.S. 385, 391-96 (1997); Cupp v. Murphy, 412 U.S. 291, 296 (1973)).

---

[2](...continued)
Code Annotated section 55-10-406(d)(1) (Supp. 2013).

[3] Following the revision of the implied consent statute, this provision is now codified at Tennessee Code Annotated section 55-10-406(d)(5)(B) (Supp. 2013).

In Schmerber v. California, 384 U.S. 757 (1966), the United States Supreme Court applied the totality of the circumstances test in the context of a drunk-driving case and upheld a warrantless blood draw based on the exigencies of the situation. There, the defendant was involved in a car accident and was arrested while at a hospital receiving treatment for injuries sustained in that accident. Id. at 758. The Court, recognizing that alcohol dissipates from the body shortly after drinking stops, reasoned that "[t]he officer might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence[.]" Id. at 770 (internal quotation marks and citations omitted). The Court noted that "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." Id. at 770-71. Thus, the Court concluded that the warrantless blood draw was justified. The Court cautioned, however, that the Schmerber holding was limited to the facts presented in that case and emphasized that "[t]he integrity of an individual's person is a cherished value of our society." Id. at 772.

Despite its limited holding, many courts, including those in Tennessee, interpreted Schmerber to mean that the natural dissipation of alcohol in the bloodstream created exigent circumstances sufficient to dispose of the warrant requirement in every drunk-driving case. See, e.g., State v. Humphreys 70 S.W.3d 752, 760-61 (Tenn. Crim. App. 2001) ("Based upon the fact that evidence of blood alcohol content begins to diminish shortly after drinking stops, a compulsory breath or blood test, taken with or without the consent of the donor, falls within the exigent circumstances exception to the warrant requirement."); State v. Janosky, No. M1999-02574-CCA-R3-CD, 2000 WL 1449367, at *5 (Tenn. Crim. App. 2000) (relying in part on "the exigent circumstances established by the nature of the evidence in cases involving intoxicated motorists" to justify a warrantless blood draw);[4] see also State v. Shriner, 751 N.W.2d 538, 545 (Minn. 2008) ("The rapid, natural dissipation of alcohol in the blood creates single-factor exigent circumstances that will justify the police taking a warrantless, nonconsensual blood draw from a defendant, provided that the police have probable cause to believe that the defendant committed the criminal vehicular operation.").

However, in 2013, the Supreme Court clarified that the "natural metabolization of alcohol in the bloodstream" does not create a per se exigency "that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." McNeely, 133 S. Ct. at 1556. Rather, the Court held, "consistent with

_____

[4] In both State v. Humphreys, 70 S.W.3d 752 (Tenn. Crim. App. 2001), and State v. Janosky, No. M1999-02574-CCA-R3-CD, 2000 WL 1449367 (Tenn. Crim. App. 2000), the warrantless blood draws were also upheld under the consent exception to the warrant requirement because the defendant in each case consented to the warrantless blood draw.

general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." Id. Indeed, the natural dissipation of alcohol in the bloodstream is one factor to consider in determining whether exigencies exists and may, in certain cases, support a finding of exigency; however, "it does not do so categorically." Id. at 1563.

With this framework in mind, we turn to the case sub judice. The State argues that the natural dissipation of alcohol in the Defendant's bloodstream combined with the additional time required to obtain a search warrant resulted in exigent circumstances that justified the warrantless taking of the Defendant's blood. The trial court rejected this argument and determined that exigent circumstances did not exist to justify the warrantless blood draw. The court found that although there was no "expedited search warrant for DUI multiple offenders" in place at the time, "there is in place a procedure to obtain search warrants in a pretty swift manner through the Johnson City Police Department." The court also found that there were at least five Johnson City Police Officers on the scene with Trooper Street that could have assisted in getting a warrant. The court acknowledged that the Defendant's arrest took place "late at night" in a metropolitan downtown area, and there was a fight between the Defendant and Trooper Street, which weighed in favor of finding exigent circumstances. However, the court reasoned that those concerns "stop[] the minute [the Defendant is] handcuffed as far as becoming [] exigent circumstances. At that point in time, we – we're simply back to an arrest," which requires a warrant to draw the Defendant's blood.

Based on McNeely, we agree with the judgment of the trial court. The record establishes that Trooper Street, while on patrol alone at 3:00 a.m., arrested the Defendant after pursuing him in a footchase and using chemical agents to subdue him. Despite the Defendant's resistance, Trooper Street subdued and arrested the Defendant within 10 minutes of his initial pursuit, ending any exigency created by his initial flight. The State highlights the fact that no other troopers were at the scene to assist Trooper Street; however, Trooper Street remained on the scene with the Defendant for approximately 30 to 45 minutes and testified that the nearest trooper was within 30 minutes of the scene. He also testified that because he used pepper spray to subdue the Defendant, his supervisor was required to respond to the scene. Although he could not recall whether his supervisor responded to the scene or met him at the hospital, he was certain his supervisor met with him and the Defendant that night. Despite this testimony, the State offered no reason why Trooper Street's supervisor or another nearby trooper could not assist Trooper Street in obtaining a warrant in a timely fashion. Additionally, while there were no procedures in place for securing a DUI warrant at the time, there were at least five Johnson City police officers that responded to the scene and likely could have assisted Trooper Street in obtaining a warrant through the Johnson City Police Department. Again, the State failed to explain why these

officers could not assist Trooper Street and presented no other evidence to suggest that obtaining a DUI warrant on this particular night would have taken any longer than in other cases. Without more, these facts do not create exigent circumstances sufficient to justify the warrantless blood draw.

## **CONCLUSION**

Based on the foregoing authorities and analysis, the judgment of the trial court suppressing the evidence of the Defendant's blood alcohol content test is affirmed.

_____

CAMILLE R. McMULLEN, JUDGE