**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-2178**

M. C., a minor by and through his parents Pamela Crawford
and John Mark Crawford,

        Plaintiff – Appellee,

    v.

DR. JAMES AMRHEIN,

        Defendant – Appellant,

    and

DR. IAN AARONSON; DR. YAW APPIAGYEI-DANKAH; KIM AYDLETTE;
MEREDITH WILLIAMS; CANDICE DAVIS, a/k/a Candi Davis; MARY
SEARCY; DOE 1, Unknown South Carolina Department of Social
Services Employee; DOE 2, Unknown South Carolina Department
of Social Services Employee; DOE 3, Unknown South Carolina
Department of Social Services Employee,

        Defendants.

------------------------------

AIS-DSD SUPPORT GROUP; THE PROGRAM FOR THE STUDY OF
REPRODUCTIVE JUSTICE-INFORMATION SOCIETY PROJECT AT THE
YALE LAW SCHOOL AND CONSTITUTIONAL SCHOLARS,

        Amici Supporting Appellee.

M. C., a minor by and through his parents Pamela Crawford and John Mark Crawford,

Plaintiff – Appellee,

v.

KIM AYDLETTE; MEREDITH WILLIAMS; CANDICE DAVIS, a/k/a Candi Davis; MARY SEARCY,

Defendants – Appellants,

and

DR. JAMES AMRHEIN; DR. IAN AARONSON; DR. YAW APPIAGYEI-DANKAH; DOE 1, Unknown South Carolina Department of Social Services Employee; DOE 2, Unknown South Carolina Department of Social Services Employee; DOE 3, Unknown South Carolina Department of Social Services Employee,

Defendants.

------------------------------

AIS-DSD SUPPORT GROUP; THE PROGRAM FOR THE STUDY OF REPRODUCTIVE JUSTICE-INFORMATION SOCIETY PROJECT AT THE YALE LAW SCHOOL AND CONSTITUTIONAL SCHOLARS,

Amici Supporting Appellee.

No. 13-2183

M. C., a minor by and through his parents Pamela Crawford and John Mark Crawford,

Plaintiff – Appellee,

v.

DR. IAN AARONSON; DR. YAW APPIAGYEI-DANKAH,

Defendants – Appellants,

and

DR. JAMES AMRHEIN; KIM AYDLETTE; MEREDITH WILLIAMS; CANDICE DAVIS, a/k/a Candi Davis; MARY SEARCY; DOE 1, Unknown South Carolina Department of Social Services Employee; DOE 2, Unknown South Carolina Department of Social Services Employee; DOE 3, Unknown South Carolina Department of Social Services Employee,

Defendants.

----------------------------

AIS-DSD SUPPORT GROUP; THE PROGRAM FOR THE STUDY OF REPRODUCTIVE JUSTICE-INFORMATION SOCIETY PROJECT AT THE YALE LAW SCHOOL AND CONSTITUTIONAL SCHOLARS,

Amici Supporting Appellee.

---

Appeals from the United States District Court for the District of South Carolina, at Charleston.  David C. Norton, District Judge.  (2:13-cv-01303-DCN)

---

Argued: September 17, 2014          Decided: January 26, 2015

---

Before MOTZ and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Reversed and remanded with instructions by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Motz and Senior Judge Davis joined.

---

**ARGUED:** Andrew Lindemann, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina; James Ben Alexander, HAYNSWORTH SINKLER BOYD, P.A., Greenville, South Carolina; Elloree Ann Ganes, HOOD LAW FIRM, LLC, Charleston, South Carolina, for Appellants.  Kristi Lee Graunke, SOUTHERN POVERTY LAW CENTER, Atlanta, Georgia, for

Appellee.  **ON BRIEF:** Kenneth N. Shaw, HAYNSWORTH SINKLER BOYD, P.A., Greenville, South Carolina, for Appellant Dr. James Amrhein.  Robert H. Hood, Barbara Wynne Showers, Deborah Harrison Sheffield, HOOD LAW FIRM, LLC, Charleston, South Carolina, for Appellants Dr. Ian Aaronson and Dr. Yaw Appiagyei-Dankah.  William H. Davidson, II, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellants Kim Aydlette, Meredith Williams, Candice Davis, and Mary Searcy.  Kenneth M. Suggs, JANET, JENNER AND SUGGS, LLC, Columbia, South Carolina; Alesdair H. Ittelson, David Dinielli, SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama; Anne Tamar-Mattis, ADVOCATES FOR INFORMED CHOICE, Cotati, California; John Lovi, William Ellerbe, STEPTOE AND JOHNSON LLP, New York, New York, for Appellee.  Suzanne B. Goldberg, Sexuality & Gender Law Clinic, COLUMBIA LAW SCHOOL, New York, New York, for Amicus AIS-DSD Support Group.  Priscilla J. Smith, LAW OFFICE OF PRISCILLA J. SMITH, Brooklyn, New York, for Amicus The Program for the Study of Reproductive Justice-Information Society Project at The Yale Law School and Constitutional Scholars.

————————————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

In April 2006, a doctor performed sex assignment surgery on sixteen-month-old M.C., who was in the legal custody of the South Carolina Department of Social Services and had been diagnosed at birth with an intersex condition. Four months after the surgery, Pamela and Mark Crawford took custody of M.C. before adopting him in December 2006. The Crawfords filed this 42 U.S.C. § 1983 action on M.C.'s behalf, against the officials and doctors who played a part in the decision to have M.C. undergo the surgery. The district court denied the officials' and doctors' motions to dismiss based on qualified immunity. Because we find that no then-extant precedent gave fair warning to those involved in the decision regarding M.C.'s surgery that they were violating his clearly established constitutional rights, we reverse.

I.

In our de novo review of a denial of a motion to dismiss based on qualified immunity, we take "as true the facts as alleged in the complaint, and view those facts in the light most favorable to the nonmoving party." Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc) (footnote omitted). We draw the following facts from M.C.'s complaint.

5

M.C. was born with ovotesticular difference/disorder of sex development (DSD). Ovotesticular DSD is an intersex condition where the individual has ovarian and testicular tissue. Hospital records first identified M.C. as male, but treating physicians later sometimes referred to M.C. as female. Through tests, examinations, and surgery, doctors determined that M.C. had "extremely elevated" testosterone levels and that his genitalia consisted of a testicle, an ovotestis with ovarian and testicular tissue, a phallus, scrotalized labia, a short vagina, and no uterus. J.A. 21-22.

In February 2005, M.C. was placed in the custody of the South Carolina Department of Social Services ("SCDSS") until December 2006, when the Crawfords adopted him. Before the adoption, SCDSS had was authorized to make medical decisions for M.C.

After many examinations, tests, two surgeries, and numerous consultations among SCDSS officials and doctors over the course of a year, Drs. James Amrhein, Yaw Appiagyei-Dankah, and Ian Aaronson recommended that M.C. have sex assignment surgery. According to M.C, the doctors recommended the "irreversible, invasive, and painful" surgery despite "no compelling biological reason to raise M.C. as either male or female." J.A. 12, 23. The doctors also knew that they could "assign M.C. a gender of rearing and postpone surgery" and that the surgery carried risks

6

of "complete loss of sexual function, scarring, loss of male fertility, gender misassignment, and lifetime psychological distress." J.A. 24-25. In short, M.C. alleges that the surgery was medically unnecessary. J.A. 25.

In April 2006, with consent from SCDSS,[1] Dr. Aaronson performed a feminizing genitoplasty on sixteen-month-old M.C. This surgery involved removing most of M.C.'s phallus, his testicle, and the testicular tissue in his ovotestis.

After adopting M.C., the Crawfords originally raised him as a girl, consistent with the sex assignment surgery. But as M.C. grew older, it became clear that he identified as male, and he is now living as a boy.

M.C., by and through the Crawfords, filed a § 1983 lawsuit against the three doctors and seven SCDSS officials who played a part in the decision to perform the sex assignment surgery. He alleged Fourteenth Amendment substantive and procedural due process violations. The district court denied the defendants' motions to dismiss on qualified immunity grounds. The court concluded that M.C. had pleaded sufficient facts to support his contention that the defendants "violated his clearly established constitutional right to procreation." J.A. 244. The defendants

---

[1] We do not consider the defendants' assertion that M.C.'s birth mother also consented to the sex assignment surgery because that was not alleged in the complaint.

appealed, and we have jurisdiction. See Winfield v. Bass, 106 F.3d 525, 528 (4th Cir. 1997) (en banc) ("To the extent that an order of a district court rejecting a governmental official's qualified immunity defense turns on a question of law, it is . . . subject to immediate appeal.").

## II.

### A.

To avoid dismissal of a complaint after a qualified immunity defense is raised, a plaintiff must allege sufficient facts to "make out a violation of a constitutional right" and the court must find that this right "was clearly established at the time of" the alleged violation. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

The right at issue must be defined "at a high level of particularity." Bland v. Roberts, 730 F.3d 368, 391 (4th Cir. 2013) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say

8

that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. The law can be clearly established "even in novel factual circumstances" so long as officials had "fair notice" that their conduct violated a constitutional right. Hope v. Pelzer, 536 U.S. 730, 739-41 (2002).

The "salient question" before us is "whether the state of the law in [2006] gave [the defendants] fair warning that their alleged treatment of [M.C.] was unconstitutional." Id. at 741. Because we find that the alleged rights at issue in this case were not clearly established at the time of M.C.'s 2006 sex assignment surgery, we need not reach the question of whether M.C. alleged sufficient facts to show that the surgery violated his constitutional rights. See, e.g., Pearson, 555 U.S. at 243-45.

### B.

We first consider M.C.'s contention, accepted by the district court, that the defendants had fair warning that the sex assignment surgery violated his constitutional right to reproduction. In support of this proposition, M.C. draws our

9

attention to three cases: Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942); and Avery v. County of Burke, 660 F.2d 111 (4th Cir. 1981). Although we acknowledge the broad statements in these cases about reproductive rights, we cannot say that a reasonable official would understand them as clearly establishing an infant's constitutional right to delay sex assignment surgery.

In Casey, the Supreme Court reaffirmed the three-part essential holding of Roe v. Wade, 410 U.S. 113 (1973), recognizing "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State"; confirming "the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health"; and establishing "the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." Casey, 505 U.S. at 846.

Skinner involved Oklahoma's statutory scheme to sterilize inmates classified as habitual criminals. 316 U.S. at 536-37. In finding the scheme unconstitutional, the Court focused its analysis on how the law "la[id] an unequal hand on those who ha[d] committed intrinsically the same quality of offense and

10

sterilize[d] one and not the other." Id. at 541. The Court gave the example that the sterilization law did not apply to embezzlers but did apply to those who committed grand larceny. Id. at 541-42.

In Avery, we considered the case of a fifteen-year-old girl who was misdiagnosed with sickle cell trait and then counseled by state actors to be sterilized. 660 F.2d at 113. Relying on their advice, "Avery and her mother consented to the sterilization," but later tests showed that she did not have sickle cell trait. Id. Avery claimed "that she was wrongfully sterilized" because of the misdiagnosis and "because sterilization is not medically recommended or proper, even when there has been a correct diagnosis of [sickle cell] trait." Id. She sued the individuals who recommended sterilization and their employers, the local county and its Board of Health and Board of Social Services.

Concluding that "[t]he county and the boards may be liable under § 1983 if their policies or customs actually caused Avery's injuries," we found that summary judgment in favor of the local government entities was improper because a genuine issue existed as to whether the county health boards' failure to implement policies for counseling and sterilizing people with sickle cell trait amounted to a tacit authorization or

11

deliberate indifference to Avery's right of procreation.  Id. at 114-15.[2]

Relying on the principles gleaned from these cases, the district court concluded that the defendants violated M.C.'s clearly established "right to procreation."  J.A. 244.  We think, however, that this frames the right too broadly for purposes of assessing the defendants' entitlement to qualified immunity.  See, e.g., Winfield, 106 F.3d at 531 (holding that the district court erred in defining the right at an inappropriate "degree of abstraction" and instead considering whether a much more factually detailed right was clearly established).

In our view, the alleged right at issue is that of an infant to delay medically unnecessary sex assignment surgery. By "medically unnecessary," we mean that no imminent threat to M.C.'s health or life required state officials to consent to the surgery, or doctors to perform it.  Viewed in that light, we do not think that Casey, Skinner, or Avery put reasonable officials on notice that they were violating M.C.'s constitutional rights. As we have repeatedly emphasized, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing

---

[2]  Notably, however, Avery made no mention of the merits of the claim against the individual defendants.

12

bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). We hold that the defendants did not transgress such a bright line in this case.

C.

Although not reached by the district court, M.C. also contends that the defendants had fair warning that the sex assignment surgery violated his constitutional rights to bodily integrity and privacy. For the right to bodily integrity, M.C. points us to Winston v. Lee, 470 U.S. 753 (1985), and Rochin v. California, 342 U.S. 165 (1952). For the right to privacy, M.C. relies on Lawrence v. Texas, 539 U.S. 558 (2003). We find these cases too dissimilar to give the defendants fair notice of the alleged constitutional violation.

Lee and Rochin involved medical procedures to secure evidence against individuals suspected of committing a crime. In Lee, the Court disapproved of a compelled surgical procedure to extract a bullet that could connect Lee to a robbery. 470 U.S. at 755. The Court in Rochin found shocking and unconstitutional three police officers' struggle to open Rochin's mouth to extract the capsules he had swallowed and, when that method proved unsuccessful, forced stomach pumping to retrieve the capsules. 342 U.S. at 166, 172. Neither of these cases, however, gave the defendants fair notice that they were

13

violating M.C.'s right to bodily integrity by performing sex assignment surgery that M.C. contends was medically unnecessary.

As for Lawrence, that case struck down "a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct." 539 U.S. at 562. We do not think that a case barring a criminal prosecution based on intimate, private sexual conduct between consenting adults gave the defendants fair notice that they could not perform sex assignment surgery on M.C. because it might impact his future sexual autonomy.

D.

M.C. also alleges that the defendants violated his clearly established procedural due process rights by not seeking a "pre-deprivation hearing" "in which a neutral fact finder could weigh the risks and purported benefits of early [sex assignment] surgery, as well as the possibility of postponement or alternatives to surgery." Appellee's Br. at 46-47. In so alleging, he equates the sex assignment surgery to forced sterilization. To support his argument, M.C. relies on Buck v. Bell, 274 U.S. 200 (1927); a concurring opinion in Skinner, 316 U.S. at 543; and numerous state statutes and cases requiring a court hearing "before an individual incapable of consent can be sterilized." Appellee's Br. at 48.

14

We find, however, that reasonable officials in 2006 did not have fair warning that they were violating M.C.'s clearly established rights by not seeking a hearing before performing, or consenting to, the sex assignment surgery. M.C.'s citations to state statutes and cases are unpersuasive because many post-date 2006, when the surgery took place, and all come from outside South Carolina, where the surgery took place.

Moreover, Buck and Skinner involved intentional, certain sterilization "of mental defectives" committed to state institutions and "habitual criminal[s]," respectively. Buck, 274 U.S. at 205; Skinner, 316 U.S. at 536. In stark contrast, the complaint in this case alleges that the sex assignment surgery was performed on an infant with "ambiguous genitals" and that such surgery "may reduce or eliminate reproductive capacity." J.A. 11, 19 (emphasis added). And although M.C.'s brief describes the surgery as "fertility-destroying" and a "surgical[] castrat[ion]," Appellee's Br. at 45, the complaint more cautiously describes the surgery as a "potential" sterilization, with "loss of male fertility" as one of the "risks." J.A. 24-25, 31-32.

While it is true that "the very action in question" need not have "previously been held unlawful" for an official to be stripped of qualified immunity, the unlawfulness must nonetheless "be apparent" "in the light of pre-existing law."

15

<u>Anderson</u>, 483 U.S. at 640. We conclude that the authority on which M.C. relies did not make it apparent that the defendants acted unlawfully by not seeking a hearing before the surgery.

### III.

Our core inquiry is whether a reasonable official in 2006 would have fair warning from then-existing precedent that performing sex assignment surgery on sixteen-month-old M.C. violated a clearly established constitutional right. In concluding that these officials did not have fair warning, we do not mean to diminish the severe harm that M.C. claims to have suffered. While M.C. may well have a remedy under state law,[3] we hold that qualified immunity bars his federal constitutional claims because the defendants did not violate M.C.'s clearly established rights.

We therefore reverse the district court's denial of the defendants' motions to dismiss and remand with instructions to dismiss the complaint.

<u>REVERSED AND REMANDED WITH INSTRUCTIONS</u>

---

[3] We have been advised that M.C. filed separate suits in state court asserting state law claims against the defendants.

16