IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2019 Session

## STATE OF TENNESSEE v. PAMELA KIDD HAFER

**Appeal from the Criminal Court for Knox County**
**No. 106212    Bob R. McGee, Judge**

_____

### No. E2018-02076-CCA-R9-CD

_____

In this interlocutory appeal, the State challenges the ruling of the trial court suppressing the results of toxicology testing conducted on the blood sample that the defendant, Pamela Kidd Hafer, provided to the police. The State asserts that the trial court erred because the defendant voluntarily consented to the warrantless drawing of her blood. In the alternative, the State contends that the trial court should have concluded that the good faith exception to the warrant requirement obviated the need to suppress the challenged evidence. Because the evidence establishes that, under the totality of the circumstances, the defendant twice voluntarily consented to the drawing of her blood, we reverse the judgment of the trial court and remand the case to the trial court for further proceedings consistent with this opinion. Because we have concluded that the defendant voluntarily consented to the warrantless blood draw and because the good faith issue was not fully litigated below, we do not consider the State's claim that the evidence was admissible via the good faith exception.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, and D. KELLY THOMAS, JR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme P. Allen, District Attorney General; and Gregory Eshbaugh, Assistant District Attorney General, for the appellant, State of Tennessee.

James A.H. Bell, Jacob A. Feuer, and Chelsea A. Harris, Knoxville, Tennessee, for the appellee, Pamela Kidd Hafer.

## OPINION

The Knox County Grand Jury charged the defendant via a five-count indictment with driving under the influence (three alternative charges), one count of felony reckless endangerment, and one count of reckless driving. Prior to trial, the defendant moved to suppress "any evidence derived from the warrantless blood draw of the defendant." She asserted that she acquiesced to the warrantless blood draw only after she was warned that she would be charged with a violation of the implied consent law if she refused the request and that, in consequence, the blood draw "was conducted without a warrant, without exigent circumstances, and without proper and voluntary consent."

At the December 9, 2016 motion hearing, Knoxville Police Department ("KPD") Officer Travis Shuler testified that he responded to a traffic accident on the "ramp from I-40 eastbound to 640 eastbound on the west end of 640" on August 2, 2013. When he arrived, Officer Shuler observed a car "on the left shoulder that had obviously rolled." He then spoke with the defendant, whom he described as "unsteady on her feet" and having slurred speech. He asked her to perform field sobriety tests, but he stopped "the test due to my fear of her safety. . . . I was afraid she was going to stumble out into the traffic that was still going by on the lanes that were open on the ramp." Officer Shuler then asked the defendant "[i]f she'd be willing to submit to a blood sample," and she replied, "Sure." He read the defendant the "Implied Consent Form" generated by the KPD, and she again agreed to submit a blood sample. The defendant did not sign the implied consent form until nearly an hour later while at the hospital for the blood draw.

During cross-examination, Officer Shuler testified that he had been dispatched to the scene of the accident to assist the other officers who were investigating the accident and that he was asked to speak with the defendant. At that time, he observed that the defendant's vehicle had suffered damage to the front end. Officer Shuler said that he directed the defendant to an area underneath the nearby overpass in an attempt to find more level footing for the field sobriety tests, but he acknowledged that the area was still not ideal. He conceded that, as he read the Implied Consent Form, the defendant was seated behind him in his patrol car and that his back was to her. Officer Shuler insisted that he "detected an odor of alcoholic beverage about her person" despite that the subsequent testing of the defendant's blood established a blood alcohol content ("BAC") of .00 percent. He admitted that he did not ask the defendant whether she had suffered any injury in the accident. Officer Shuler acknowledged that, after he stopped the field sobriety tests, he asked the defendant if she would consent to a blood test. Officer Shuler testified, "She eventually said fine. I don't recall what she said the first time I asked her." He said that, after they got into his patrol car and after he had read the Implied Consent Form, the defendant again consented to having her blood drawn. He admitted that he did not give the form to the defendant so that she could read it.

Officer Shuler agreed that the Implied Consent Form was an administrative form created by the KPD and that he relied on the form rather than Code section 55-10-403, saying, "I go by the form, because it's supplied by my department and accepted by the court." He agreed that the form indicated that the refusal of blood alcohol testing could result in a loss of the defendant's driver's license and, if she had other qualifying convictions, a sentence in jail.

The video recording captured from Officer Shuler's cruiser was exhibited to his testimony. Although the defendant cannot be seen on the entirety of the three-part video recording, the recording did capture the audio portion of Officer Shuler's entire encounter with the defendant. The recording captured Officer Shuler's arrival at the scene of what was obviously a very serious car accident. Shortly after Officer Shuler exited his cruiser, Officer Shuler's microphone recorded another officer's speaking with a witness, who described the defendant's driving as "erratic" and "just totally craziness" before she struck the other vehicle involved in the accident. The witness also indicated to the officers that the defendant was "under the influence."

When Officer Shuler began speaking with the defendant, she indicated that she had been "coming down 50" before correcting herself and saying that she had been driving on Interstate 40 before the accident. Shortly into the conversation, Officer Shuler told the defendant that he could smell the odor of an alcoholic beverage coming from her person, and the defendant denied having consumed alcohol. Following this response, Officer Shuler said, "I'm going to ask you to submit a blood sample so we can make sure you ain't got nothing in your system." After a brief pause, he added, "I need to know your answer ma'am." The defendant's response is not audible.

At that point, Officer Shuler escorted the defendant to a grassy area to perform field sobriety tests. Again, only the audio portion of the field sobriety tests was captured by the recording, and the audio quality suffered as Officer Shuler traveled farther from his cruiser. In any event, the audio established that the defendant could not or would not follow the directions provided by Officer Shuler as he attempted to administer the field sobriety tests. The defendant again denied drinking and stated that she had taken blood pressure medication. Even after Officer Shuler moved the defendant to a shadier area, she could not complete the field sobriety tests. Officer Shuler pointed out the defendant's lack of balance and inability to perform any of the tests before asking, "Would you like to explain to me what you've got in your system that's making you . . . lose your balance?" The defendant's only response was "blood pressure." At that point, Officer Shuler asked, "Would you be willing to submit a blood sample for me?" The defendant immediately and unequivocally said, "Sure."

Officer Shuler escorted the defendant to his cruiser and placed her in the backseat. He activated the cruiser's interior camera before walking away from the cruiser for a brief period. This portion of the video recording showed the defendant seated in the backseat. While so situated, the defendant rifled through her purse and used her cellular telephone to call someone and tell them that she was "going to jail." During the call, she denied having consumed any alcohol. When Officer Shuler returned to the cruiser sometime later, he told the defendant, "I need to read something to you. I need you to understand it." The defendant agreed, and Officer Shuler read to her the Implied Consent form. Despite that the defendant suggested during cross-examination that Officer Shuler read the form at a pace greater than his regular speech, the recording establishes that his reading was not so quick that he could not be heard and clearly understood. The defendant certainly indicated to Officer Shuler that she understood the form. After reading the form Officer Shuler said, "With those things in mind, are you still willing to submit a blood sample?" The defendant again did not hesitate before replying, "Yes."

The defendant, citing *North Dakota v. Birchfield*, argued that the language in the Implied Consent Form indicating that the defendant would be charged with an offense if she refused blood alcohol testing was so coercive as to render her consent involuntary. The State argued that the defendant voluntarily consented to the test before the form was read to her. At the conclusion of the hearing, the trial court took the case under advisement. The court reconvened on the issue more than a year later on December 14, 2017. Neither party presented evidence at that proceeding, but the State argued for the first time that Officer Shuler was "acting in good faith when [he] advised the[] defendant[] of the Implied Consent Law" and that, based on our supreme court's ruling in *State v. Reynolds*, the trial court should not suppress the results of the blood draw. The trial court observed that the state of the law on the admissibility of toxicology results from a warrantless blood draw was "a mess" but ultimately determined that "in Tennessee, if an officer wants to get a blood draw, there are only two ways to do it, either with a warrant or by finding an exigent circumstance." The court determined that recent Supreme Court jurisprudence indicated that the reading of the Implied Consent Form was "coercive" and that "any purported waiver that results from that kind of technique, that such a waiver would not be truly voluntary and informed and knowing." The court concluded that "[t]he implied consent statute is just not a viable way to travel at this point." The court found that "there was no hint of a warrant or exigent circumstances" in the defendant's case. The court did not "fault the police officers at all for not being able to predict the future and know what the appellate [c]ourts are going to do with some of these state statutes." The State indicated that, based upon the trial court's ruling, it would likely seek a Rule 9 interlocutory appeal, and the defendant indicated that she had no objection to an interlocutory appeal.

In its written order granting the defendant's motion to suppress, the trial court again concluded that, in order to "get a blood draw" in a case of suspected DUI, an officer must get a warrant in the absence of exigent circumstances. Because "there was no hint of a warrant or an exigent circumstance in this case," which the court described as "a routine traffic stop that escalated," the taking of the defendant's blood was "not performed in a constitutional fashion." Following this ruling, the trial court and, later, this court granted the State's bid for an interlocutory appeal of the ruling.

In this appeal, the State argues that the trial court erred by suppressing the results of the blood alcohol testing in this case because the defendant "agreed to give that sample both before and after accurately being advised of the consequences for refusal." The State also asserts that, in the alternative, the good faith exception to the warrant requirement applies in this case because "the officer relied on both statutory and precedential authority that required him before collecting a blood sample, to advise [the] defendant of the consequence for refusing to provide a sample." The defendant contends that the trial court did not err by suppressing the challenged evidence because the defendant's consent "was involuntary both before and after being read a coercive form generated by the" KPD. The defendant avers that the consideration of the application of the good faith exception is not appropriate because that issue was not presented in the trial court.

Although the entirety of the interaction between Officer Shuler and the defendant was captured by at least the audio portion of the video recording, that recording was not the sole evidence presented at the evidentiary hearing. Officer Shuler also testified. Accordingly, we apply the standard of review announced in *State v. Odom*. *See State v. Garcia*, 123 S.W.3d 335, 342-43 (Tenn. 2003) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Under this standard, questions of witness credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). We review de novo the trial court's application of the law to the facts. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We consider the questions presented with these standards in mind.

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic

-5-

constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455. Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception.").

The drawing of the defendant's blood most certainly constituted a search for purposes of the fourth amendment. "Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely*, 569 U.S. at 148 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)); *see also Skinner v. Ry. Labor Execs' Ass'n.*, 489 U.S. 602, 616 (1989) ("We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." (quoting *Schmerber v. California*, 384 U.S. 757, 767-68 (1966) (alteration in *Schmerber*))). Accordingly, we must determine whether the taking of the defendant's blood without a warrant was justified by an exception to the warrant requirement.

The generally recognized exceptions to the Fourth Amendment warrant requirement include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and others." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (citations omitted). "Well settled among the exceptions to the warrant requirement, and the one with which we are engaged here, is consent to search." *Id.* (citations omitted). Consent to search, voluntarily given, acts as an exception to both the state and federal warrant requirements. *Florida v. Bostick*, 501 U.S. 429, 438 (1991) (stating that the "decision to cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant only if the cooperation is voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 243 (1973) (stating that "there is nothing constitutionally suspect in a person's voluntarily allowing a search"); *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996). To satisfy the constitutional reasonableness standard, the State must establish that the consent was "unequivocal, specific,

-6-

intelligently given, and uncontaminated by duress or coercion." *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). "The question of whether an accused voluntarily consented to the search is a question of fact which focuses upon the totality of the circumstances." *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (citing *Schneckloth*, 412 U.S. at 248-49); *see also Cox*, 171 S.W.3d at 185 (stating that "we analyze the voluntariness of consent . . . under the totality of the circumstances criteria"). "The pertinent question is . . . whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Reynolds*, 504 S.W.3d 283, 306-07 (Tenn. 2016) (quoting *Cox*, 171 S.W.3d at 185).

Among the factors to be considered when determining the voluntariness of consent to search are the time and place of the encounter, the number and demeanor of the police officers present, whether the police or the accused initiated the contact and/or consent to search, and the "personal characteristics of the individual giving consent," including the individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel." *Cox*, 171 S.W.3d at 185.

*Statutory Implied Consent as Voluntary Consent to Search*

The State does not specifically assert that the defendant's consent to search in this case was supplied via the implied consent statute, and we conclude that, based upon recent jurisprudence from the Supreme Court set out below, no credible argument can be made that the statutory implied consent actually supplies the type of voluntary consent sufficient to create an exception to the warrant requirement.

At the time of the offense, Code section 55-10-406 provided, in pertinent part, as follows:

> (a) Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other

-7-

intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating § 39-13-106, § 39-13-213(a)(2) or § 39-13-218.

. . . .

(c)    Any law enforcement officer who requests that the driver of a motor vehicle submit to either or both tests authorized pursuant to this section, for the purpose of determining the alcohol or drug content, or both, of the driver's blood, shall, prior to conducting either test or tests, advise the driver that refusal to submit to the test or tests will result in the suspension by the court of the driver's operator's license; if the driver is driving on a license that is cancelled, suspended or revoked because of a prior conviction as defined in § 55-10-405, the refusal to submit to the test or tests will, in addition, result in a fine and mandatory jail or workhouse sentence; and if the driver is convicted of a violation of § 55-10-401, that the refusal to submit to the test or tests, depending on the person's prior criminal history, may result in the requirement that the person be required to operate only a motor vehicle equipped with a functioning ignition interlock device.  The court having jurisdiction of the offense for which the driver was placed under arrest shall not have the authority to suspend the license of a driver or require the driver to operate only a motor vehicle equipped with a functioning ignition interlock device pursuant to § 55-10-417 who refused to submit to either or both tests, if the driver was not advised of the consequences of the refusal.

(d)(1) Except as required by subdivision (d)(5), court order or search warrant, if such person is placed under arrest, requested by a law enforcement officer to submit to either or both tests, advised of the consequences for refusing to do so, and refuses to submit, the test or tests to which the person refused shall not be given, and the person shall be charged with violating subsection (a).  . . .

T.C.A. § 55-10-406(a) (Supp. 2012).

In *Birchfield*, the case relied upon by the defendant and the trial court, Birchfield was criminally prosecuted for refusing a warrantless blood draw. The Supreme Court considered the question whether state implied consent laws that "make it a crime for a motorist to refuse to be tested after being lawfully arrested for driving while impaired" "violate the Fourth Amendment's prohibition against unreasonable searches." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2166-67 (2016). The Court observed that scientific testing for BAC became the norm after states passed laws making it illegal to drive with a BAC in excess of a statutory limit and that "[b]ecause the cooperation of the test subject is necessary when a breath test is administered and highly preferable when a blood sample is taken, the enactment of laws defining intoxication based on BAC made it necessary for [s]tates to find a way of securing such cooperation." *Id.* at 2168-69. To this end, all 50 states eventually passed implied consent laws that "provided that cooperation with BAC testing was a condition of the privilege of driving on state roads and that the privilege would be rescinded if a suspected drunk driver refused to honor that condition." *Id.* at 2169. Despite the penalties imposed for the refusal of BAC testing— typically "[s]uspension or revocation of the motorist's driver's license" and/or the admission of "evidence of the motorist's refusal . . . as evidence of likely intoxication in a drunk-driving prosecution"—a large percentage of drivers continued to refuse testing. *Id.* "To combat the problem of test refusal, some States have begun to enact laws making it a crime to refuse to undergo testing." *Id.*

After noting that the Court had already determined that the exigent circumstances exception could apply in drunk driving cases, subject to a "careful case-by-case assessment of exigency," *id.* at 2174 (quoting *McNeely*, 569 U.S. at 152), the Court considered whether the search incident to arrest exception to the warrant requirement might also be applied in drunk driving cases by examining the facts presented in the three cases before it, in each of which "the drivers were searched or told that they were required to submit to a search after being placed under arrest for drunk driving." *Birchfield*, 136 S. Ct. at 2174. Following a careful analysis, the Court held "that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving" but that because "[b]lood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test," "no satisfactory justification" exists "for demanding the more intrusive alternative without a warrant." *Id.* at 2184.

"Having concluded that the search incident to arrest doctrine does not justify the warrantless taking of a blood sample," the Court moved on to the question whether warrantless blood draws were "justified based on the driver's legally implied consent to submit to them," but it did not directly answer that question. *Id.* Instead, the court noted that consent was a well-established exception to the warrant requirement and "that sometimes consent to a search need not be express but may be fairly inferred from

context." *Id.* (citations omitted). The Court also observed that it had "referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply" but nevertheless concluded that "[i]t is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test" and that "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." *Id.*

> Borrowing from our Fifth Amendment jurisprudence, the United States suggests that motorists could be deemed to have consented to only those conditions that are "reasonable" in that they have a "nexus" to the privilege of driving and entail penalties that are proportional to severity of the violation. But in the Fourth Amendment setting, this standard does not differ in substance from the one that we apply, since reasonableness is always the touchstone of Fourth Amendment analysis. And applying this standard, we conclude that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense.

*Id.* at 2186 (citations omitted).

The Court then set about applying its holdings to the three petitioners before it. As to Birchfield, the Court held:

> Petitioner Birchfield was criminally prosecuted for refusing a warrantless blood draw, and therefore the search he refused cannot be justified as a search incident to his arrest or on the basis of implied consent. There is no indication in the record or briefing that a breath test would have failed to satisfy the State's interests in acquiring evidence to enforce its drunk-driving laws against Birchfield. And North Dakota has not presented any case-specific information to suggest that the exigent circumstances exception would have justified a warrantless search. Unable to see any other basis on which to justify a warrantless test of Birchfield's blood, we conclude that Birchfield was threatened with an unlawful search and that the judgment affirming his conviction must be reversed.

*Id.* As to Bernard, the Court held:

-10-

Bernard, on the other hand, was criminally prosecuted for refusing a warrantless breath test. That test was a permissible search incident to Bernard's arrest for drunk driving, an arrest whose legality Bernard has not contested. Accordingly, the Fourth Amendment did not require officers to obtain a warrant prior to demanding the test, and Bernard had no right to refuse it.

*Id.* As to the final petitioner, Beylund, the Court held:

Unlike the other petitioners, Beylund was not prosecuted for refusing a test. He submitted to a blood test after police told him that the law required his submission, and his license was then suspended and he was fined in an administrative proceeding. The North Dakota Supreme Court held that Beylund's consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests. Because voluntariness of consent to a search must be "determined from the totality of all the circumstances," we leave it to the state court on remand to reevaluate Beylund's consent given the partial inaccuracy of the officer's advisory.

*Id.* (citation omitted). Importantly, the Court did not, in any of the three cases, conclude that statutory implied consent equated to the type of voluntary consent necessary to overcome the requirement that the police obtain a warrant for a blood draw. Indeed, the Court remanded Beylund's case for reconsideration of the voluntariness of his consent using the traditional totality of the circumstances test. Essentially, the Court held that a driver could be prosecuted for refusing a warrantless breath test because such a test was justified by the search incident to arrest exception to the warrant requirement but that a driver could not be prosecuted for refusing a warrantless blood test that was not justified by an exception to the warrant requirement.

The Court most recently addressed the Fourth Amendment impact of implied consent laws in *Mitchell v. Wisconsin*. Mitchell moved to suppress the results of a warrantless blood test administered while he was unconscious and, therefore, unable to consent "on the ground that it violated his Fourth Amendment right against 'unreasonable searches.'" *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2532 (2019). "Wisconsin chose to rest its response on the notion that its implied-consent law (together with Mitchell's free choice to drive on its highways) rendered the blood test a consensual one, thus curing any

Fourth Amendment problem." *Id.* Following the trial court's denial of his motion to suppress, Mitchell was convicted of the charged offenses.

> The intermediate appellate court certified two questions to the Wisconsin Supreme Court: first, whether compliance with the State's implied-consent law was sufficient to show that Mitchell's test was consistent with the Fourth Amendment and, second, whether a warrantless blood draw from an unconscious person violates the Fourth Amendment. The Wisconsin Supreme Court affirmed Mitchell's convictions, and we granted certiorari to decide "[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement," . . . .

*Id.* (citation omitted).

The Supreme Court again observed that it had referred approvingly to implied consent laws but concluded that its decisions had "*not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize.*" *Id.* at 2532-33 (emphasis added). "Instead," the court observed, "we have based our decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving." *Id.* Within this framework, the Court ultimately concluded that the warrantless drawing of Mitchell's blood draw was acceptable under the exigent circumstances exception, holding:

> When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Because Mitchell did not have a chance to attempt to make that showing, a remand for that

-12-

purpose is necessary.

*Id.* at 2539.  Importantly, the plurality opinion did not rely on the consent exception to the warrant requirement.  Additionally, Justice Sotomayor, writing for the three-justice dissent, stated that "[w]ith that sliver of the plurality's reasoning I agree" and indicated that the three dissenting justices "would go further and hold that the state statute, however phrased, cannot itself create the actual and informed consent that the Fourth Amendment requires."  *Id.* at 2545 (Sotomayor, J., dissenting).  Thus, although neither *Birchfield* nor *Mitchell* explicitly holds that statutory implied consent does not provide constitutionally valid consent for a warrantless blood alcohol testing, it is our view that these cases really cannot be read in any other way, particularly given that the four-justice plurality and the three-justice dissent in *Mitchell* stated as much.  If statutory implied consent laws, as their name suggests, actually provided constitutionally valid consent to search, then the Court would not have needed to evaluate the natural dissipation of alcohol as it relates to the exigent circumstances exception, *see McNeely*, 569 U.S. at 153-54, to resort to the search incident to arrest exception for the administration of warrantless breath tests, *see Birchfield*, 136 S. Ct. at 2184, or to have carved out an "almost always" category of exigent circumstances for the administration of warrantless blood tests on unconscious DUI suspects, *see Mitchell*, 139 S. Ct. at 2539.  Instead, the Court could have relied on the implied consent laws from each of the states to hold that the evidence obtained via the warrantless BAC testing in those cases was admissible via the consent exception to the warrant requirement.  We agree with this apt synopsis by the Massachusetts Court of Appeals:

> To summarize, the consequences of *McNeely*, *Birchfield*, and *Mitchell* for our assessment of the standards for evaluating consent to a blood draw by a defendant with respect to whom there is probable cause to believe he or she was operating a motor vehicle while under the influence of intoxicating liquor are as follows:
>
> A blood draw requires a warrant or exigent circumstances excusing the failure to obtain a warrant.  There are not necessarily exigent circumstances when there is probable cause to believe someone has been operating while under the influence, despite the predictable dissipation of blood alcohol.  When there is neither a warrant nor exigent circumstances, blood may be drawn only with consent that meets the Federal constitutional standard of actual, voluntary consent under the Fourth Amendment, not the lower standard of consent required under our statute.

*Commonwealth v. Dennis*, 135 N.E.3d 1070, 1078-79 (Mass. Ct. App. 2019).

*Actual, Voluntary Consent*

We turn then to the question whether the defendant voluntarily consented to the blood draw in this case. As pointed out above, this is a question we answer by examining the totality of the circumstances. *See Birchfield*, 136 S. Ct. at 2186.

The encounter between Officer Shuler and the defendant occurred in the middle of an August afternoon on the side of the roadway following a traffic accident. Although other officers were present on the scene, they were busy investigating the accident, and the defendant interacted almost exclusively with Officer Shuler.[1] Officer Shuler first asked the defendant if she would consent to a blood draw after he observed that she was unsteady on her feet, that she appeared to be slurring her words, and after he smelled what he believed to be an odor of alcoholic beverage emanating from her person.[2] Her response to that inquiry is not audible on the video recording, but Officer Shuler testified that she agreed to the blood draw. Later, after the defendant was unable to complete the field sobriety tests, Officer Shuler again asked whether the defendant would be willing to submit to a blood test, and she responded with an unequivocal, "Sure."

After she agreed to the blood test, Officer Shuler escorted the defendant to his cruiser and then read to her the Implied Consent Form developed by the KPD, which form advised the defendant that, if she refused the test, she would be "charged with the offense of violation of the implied consent law" and that, if she was "found guilty" of that offense, her "license will be revoked for a period of one year." The form also provided that, if the defendant had a prior conviction for DUI or vehicular assault, a finding that she violated the implied consent law could result in a license revocation period of two years and that, if she had a prior conviction for vehicular assault, vehicular homicide, or aggravated vehicular homicide, a finding that she violated the implied consent law could result in a sentence of "a mandatory minimum of five days and up to eleven months, twenty-nine days in jail and a fine of up to $1000 in addition to the driver's license revocation." Officer Shuler then asked the defendant if she understood the form, and she

---

[1] The defendant was questioned briefly by another officer as she sat in the rear of Officer Shuler's patrol car.

[2] That the defendant's blood was negative for the presence of alcohol is irrelevant.

-14-

said that she did. He then asked if, now being aware of the potential penalties for refusing, she "still" agreed to the blood test, and the defendant again agreed unequivocally to a blood test. Officer Shuler was polite to the defendant throughout the encounter, remained calm throughout, never raised his voice, and never acted in a threatening manner.

The record contains little information regarding the defendant's personal characteristics. Although the defendant argues that she "was under effect of medications that impaired her judgment and reasoning," no evidence was presented at the evidentiary hearing to support such a conclusion. *Cf. Reynolds*, 504 S.W.3d at 309 (stating that in light of "the trial court's factual findings based upon medical proof in the record regarding the defendant's physical condition and the adverse [e]ffects the medications had on her judgment and reasoning the record does not establish that the defendant had the capacity to revoke her statutory implied consent"). The toxicology results established the presence of carbamazepine, diazepam, nordiazepam, and clonazepam in the defendant's blood, but no medical evidence was presented to suggest what effect, if any, these medications might have had on her ability to voluntarily consent to the blood draw. Certainly nothing in the video recording suggests that the defendant was injured or that she was too intoxicated or impaired to understand her circumstances and voluntarily consent to the blood draw. She described the events of her day to Officer Shuler, including the location of the bank branch she had visited before the accident, and the route she had traveled before the accident occurred. The video also shows the defendant using her cellular telephone to place a call and say that she was "going to jail."

The defendant makes much of the fact that she was not aware, prior to the reading of the implied consent form, that she had the right to refuse Officer Shuler's request. "[K]nowledge of the right to refuse," however, "is not a prerequisite of a voluntary consent." *Schneckloth*, 412 U.S. at 234. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth*, 412 U.S. at 227. Our state supreme court has specifically "decline[d] to impose a requirement that the subject be informed of the right to refuse consent" and has "[i]nstead, . . . continue[d] to adhere to the *Schneckloth* totality of the circumstances criteria, which may specifically include a subject's knowledge of the right to refuse consent." *Cox*, 171 S.W.3d at 184.

Based upon the totality of the circumstances, we conclude that the defendant voluntarily consented to the blood draw before Officer Shuler read the implied consent form to her. We also conclude that the ruling in *Birchfield* does not render the defendant's consent given after the reading of the form involuntary. As indicated above, the *Birchfield* plurality did state "that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Birchfield*, 136 S. Ct. at

-15-

2186. That statement, however, must be understood in the context of the opinion as a whole, with particular attention paid to the disposition of the three cases before the Court. Birchfield refused a warrantless blood draw that was not "justified as a search incident to his arrest or on the basis of implied consent" or supported by a finding of exigent circumstances, and the Supreme Court concluded "that Birchfield was threatened with an unlawful search and that the judgment affirming his conviction [for violating the implied consent statute] must be reversed." *Id.* As to Bernard, however, who "was criminally prosecuted for refusing a warrantless breath test," the Court affirmed his conviction for violating the implied consent statute because the test that Bernard refused "was a permissible search incident to Bernard's arrest for drunk driving." *Id.* As to Beylund, who had submitted to a blood test and, as a result, whose case was the most similarly situated to the defendant's, the Court remanded the case to the state court "to reevaluate Beylund's consent" using the totality of the circumstances test. *Id.* The Court concluded that the reevaluation should include an examination of the impact of "the partial inaccuracy of the officer's advisory" to Beylund. To be sure, Officer Shuler advised the defendant that, should she refuse the blood draw, she could be convicted of the offense of violating the implied consent law and lose her license for one year.[3] We cannot say, however, that this advisory can be said to have extracted the defendant's consent "on pain of committing a criminal offense." *Birchfield*, 136 S. Ct. at 2186. No evidence suggests that the defendant's "will was overborne" or "her capacity for self-determination critically impaired." *Reynolds*, 504 S.W.3d at 307 (citing *Cox*, 171 S.W.3d at 185). Having considered the totality of the circumstances, including Officer Shuler's reading of the implied consent form, we conclude that the defendant voluntarily consented to the blood draw in this case. In consequence, the trial court erred by granting the defendant's motion to suppress in this case.

*Good Faith Exception*

As indicated above, the State argues as an alternative avenue of admission that Officer Shuler relied in good faith on existing precedent in obtaining the blood sample in this case. The State did not raise the good faith exception in either its response to the motion to suppress or at the hearing on the motion to suppress. The State raised the issue for the first time when the court reconvened nearly a year after the evidentiary hearing. The trial court did not address the issue either in open court or in its order granting the motion to suppress. As a result, the State elicited no facts in support of its claim that Officer Shuler relied in good faith on existing precedent, and the record is

---

[3] Although the Implied Consent Form contained language that referenced a term of imprisonment, that language clearly refers to those drivers with prior convictions. Presumably, even one unfamiliar with the particulars of one's driving record would know if one had been convicted of offenses as serious as vehicular assault, a Class D felony, aggravated vehicular assault, a Class C felony, or vehicular homicide, a Class B or C felony.

inadequate for a determination whether Officer Shuler's "action is in objectively reasonable good faith reliance on 'binding appellate precedent' that 'specifically authorizes a particular police practice.'" *Reynolds*, 504 S.W.3d at 313-14 (citation omitted). Consequently, we would be hesitant to address the issue of the application of the good faith exception in this case. Because we have concluded that the warrantless blood draw was supported by the defendant's voluntary consent, however, we need not determine whether the good faith exception applies in this case.

Accordingly, we reverse the judgment of the trial court granting the defendant's motion to suppress and remand the case for proceedings consistent with this opinion.

_____
JAMES CURWOOD WITT, JR., JUDGE